**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James HILLSMAN and Clinton Bush, Defendants-Appellants.**

Nos. 75-1087, 75-1088.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1975.

Decided Sept. 5, 1975.

Certiorari Denied Dec. 15, 1975.

See 96 S.Ct. 570.

Harold Abrahamson, Hammond, Ind., for defendants-appellants.

John R. Wilks, U.S. Atty., Frank J. Gray, Asst. U.S. Atty., Fort Wayne, Ind., Fred W. Grady, Asst. U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before MOORE, Senior Circuit Judge,* and PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

The defendants James Hillsman and Clinton Bush were convicted by a jury of assaulting a federal officer, in violation of 18 U.S.C. § 111. On appeal, the defendants contend that: (1) the indictment should have been dismissed because the officer who was assaulted was not, at the time of the assault, a person designated in 18 U.S.C. § 1114; (2) the district court erred in refusing to instruct the jury that if the defendants reasonably believed the federal officer to be a fleeing felon, the defendants should be acquitted; and (3) the district court erred in admitting certain testimony.

I

On February 8, 1974, the defendants, along with two to three hundred other persons, attended a funeral in Gary, Indiana. Several agents of the Drug Enforcement Administration were conducting undercover surveillance at the funeral home for the purpose of observing and identifying suspected narcotics dealers. All of the agents involved in the surveillance wore ordinary "street" clothes and drove unmarked cars.

Agent David Munson, who was equipped with a video tape camera, stationed himself outside the funeral home alongside photographers from a Gary newspaper and began filming the mourners as they left the funeral home. Most of the several hundred mourners at the funeral home (including the defendants) were black and a group of the black mourners demanded that Munson, who is white, cease taking pictures and leave the area. One member of the crowd, William Hanyard, began shoving and hitting Munson when he continued to film the mourners. The defendants Hillsman and Bush were not identified as being in any way involved in the verbal or physical exchange with Munson.

* Senior Circuit Judge Leonard Page Moore of the United States Court of Appeals for the Second Circuit was sitting by designation.

Agent Kenneth Rhodes, the acting agent in charge of the DEA in the area, was approximately six feet from Munson at this time and observed Hanyard's attack on the agent. Intending to shoot Hanyard, Rhodes, who is black, drew his revolver and began to assume the "combat position." However, before he was able to get into this position, Rhodes either stepped back or was pushed from the rear and his gun discharged prematurely. The bullet merely grazed Hanyard but struck and killed Albert Griffin, an innocent bystander.

Immediately after the shot was fired, Rhodes announced that he was a federal agent and told Munson, "Let's get out of here." Although Munson heard the latter statement, he did not hear Rhodes announce that he was a federal officer. Rhodes and Munson then moved to their cars. Munson jumped into a car with several other agents and Rhodes stopped to talk briefly with one of these agents. Rhodes then began walking toward his own car. At no time did Rhodes or Munson approach the body of Griffin.

As Rhodes was moving toward his car, a woman in the crowd pointed at him and said, "He is the one; there he goes." A group of the mourners then began running after Rhodes. As Rhodes drove away, shots were fired at his car. One bullet struck the car but Rhodes himself was not injured.

Hillsman and Bush were identified as being members of the group that chased Rhodes and were observed firing weapons at Rhodes' car.

## II

Hillsman and Bush contend that the indictment in this case was fatally defec-tive in that the federal officer assaulted was not a member of an agency designated in the pertinent statutes.

The defendants were charged in the indictment with assaulting Agent Rhodes, an officer of the Drug Enforcement Administration, in violation of 18 U.S.C. § 111. Section 111 prohibits, *inter alia*, forcibly assaulting, intimidating, or interfering with any person designated in 18 U.S.C. § 1114.[1] The defendants point out that in February 1974, at the time of the assault on Rhodes, § 1114 designated, as protected persons, the members of the Bureau of Narcotics and Dangerous Drugs, but not those of the Drug Enforcement Administration.[2] The defendants argue that since the Drug Enforcement Administration was not included in § 1114 at the time of the assault on Rhodes, the indictment should have been dismissed for failure to charge an offense.

The seeming discrepancy in § 1114 was, as the defendants concede, the result of a reorganization of the federal agencies involved in narcotics law enforcement. In July of 1973, pursuant to a reorganization plan,[3] the Bureau of Narcotics and Dangerous Drugs was abolished and its functions transferred to the newly created Drug Enforcement Administration. Section 1114, however, was not amended to substitute this new agency for the defunct Bureau of Narcotics and Dangerous Drugs until October 26, 1974, after the assault in the present case.

In *United States v. Irick,* 497 F.2d 1369 (5th Cir. 1974), the Fifth Circuit was faced with the identical issue. The Fifth Circuit held that, under 5

---

1. 18 U.S.C. § 111 provides:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. At the time of the assault on Rhodes, 18 U.S.C. § 1114 provided, in pertinent part:

"Whoever kills . . . any officer or employee . . . of the Bureau of Narcotics and Dangerous Drugs, . . . while engaged in the performance of his official duties, or on account of the performance of his official duties . . . shall be punished as provided under sections 1111 and 1112 of this title."

3. Reorganization Plan No. 2, 2 U.S.Code Cong. & Adm.News p. 3554 (1973).

U.S.C. § 907(a), after the reorganization of the agencies, the agents of the Drug Enforcement Administration were within the ambit of sections 111 and 1114, even though, at the time of the assault in question, section 1114 had not yet been modified expressly to include the Drug Enforcement Administration. We agree.

5 U.S.C. § 907(a) provides, in pertinent part:

"*A statute enacted,* and a regulation or other action made, prescribed, issued, granted, or performed in respect of or by an agency or function affected by a reorganization under this chapter, *before the effective date of the reorganization, has, except to the extent rescinded, modified, superseded, or made inapplicable by or under authority of law or by the abolition of a function, the same effect as if the reorganization had not been made.*" (Emphasis added.)

As the Fifth Circuit noted, the purpose of § 907(a) is to avoid "leav[ing] a hiatus in existing law when a reorganization has taken place." 497 F.2d at 1372. Thus, when a reorganization of an agency occurs, § 907(a) provides for the continuing effect of any statute relating to the agency and enacted before the effective date of the reorganization. Pursuant to § 907(a), a prior existing statute has "the same effect as if the reorganization had not been made."

In the present case, then, once the reorganization took place, the agents of the Drug Enforcement Administration were "protected persons" under § 1114 to the same extent that the agents of the Bureau of Narcotics and Dangerous Drugs had been, even though § 1114 had not yet been formally modified to reflect the reorganization of the agency. Were we to accept the defendants' contention that the agents of the Drug Enforce-

ment Administration were not within the ambit of § 1114 until the formal modification of § 1114, we would be frustrating the very purpose of § 907(a) by creating just the type of hiatus that the statute seeks to avoid.

 The defendants contend, however, that, since it is a penal statute, § 1114 must be strictly construed and applied only to the agencies specifically designated in it. This argument was properly answered by the Fifth Circuit in *Irick*:

"The strict construction concept does not . . . require that other pertinent statutes, in this case section 907(a), be disregarded. Furthermore, the doctrine is grounded in the principle that persons accused of a crime must be afforded fair warning of the prohibited conduct. . . . It cannot be validly argued that defendants were not given adequate notice of the prohibited conduct, that is, the assault of a federal officer. Section 907(a) in no way changes the nature of this conduct." 497 F.2d at 1373.

## III

The defendants next argue that the district court erred in failing to instruct the jury that if the defendants reasonably believed Rhodes to be a fleeing felon, the jury should find the defendants not guilty.

The undisputed evidence indicated that neither Bush nor Hillsman was involved in the Munson-Hanyard skirmish. Both defendants testified that although they saw the altercation, they, like Agent Munson, did not hear Rhodes announce that he was a federal officer.[4] According to their testimony, the defendants pursued Rhodes because they believed him to be a felon fleeing from the scene

---

4. Bush testified that during the Munson-Hanyard skirmish he was on the opposite side of the street from the site of the altercation. Bush saw Hanyard talking to Munson but because a bus pulled up in the street, Bush did not actually see Rhodes shoot Hanyard and Griffin. Bush testified that he began chasing Rhodes when the woman pointed at Rhodes and shouted that he was the one who had fired the shot.

Hillsman, although not involved in the Munson-Hanyard altercation, was in a position which enabled him to see Rhodes fire his gun.

of the crime and they wanted to catch and hold him until the police arrived. If Hillsman and Bush did fire at Rhodes' car, a point which the defense did not concede, they did so, according to one theory of the defense, only because of their mistaken belief that Rhodes was a fleeing felon.

In its charge to the jury, the district court instructed the jury that, in order to find the defendants guilty, the jury must "first find that they committed an intentional act willfully done without legal excuse." The lower court also instructed, however, that:

"In order for the Government to establish the offense charged in the indictment beyond a reasonable doubt, it is not necessary that the Government prove as part of its case that the defendants or either of them had actual knowledge that the victim was a Federal Drug Enforcement Agency Agent who was engaged in the performance of his official duties."

With respect to the defendants' claim that they were only seeking to stop a person they believed to be a fleeing felon, the district court gave a lengthy instruction concerning the right of a private citizen to make an arrest. The court however, refused to give a defense instruction which provided:

"There has been evidence that the Defendants, James Hillsman and Clinton Bush, gave chase to Kenneth Rhodes, as he was leaving the scene of the funeral of Van Lott in the vicinity of 23rd Avenue and Washington Street in Gary, Indiana, and that at the time the Defendants gave chase they did not have knowledge that Kenneth Rhodes was a Federal Agent.

"If you find from the evidence that the Defendants, James Hillsman and Clinton Bush, acted out of reasonable belief that Kenneth Rhodes was not a Federal Agent but instead was a private citizen who the Defendants, James Hillsman and Clinton Bush, had reasonable cause to believe had committed a felony and was fleeing the scene in order to avoid apprehension, and that the Defendants, James Hillsman and Clinton Bush, chased Kenneth Rhodes in order to stop his flight and detain him then you must find the Defendants, James Hillsman and Clinton Bush not guilty."

█ A defendant in a criminal case is, of course, entitled to have the jury instructed on any theory of the defense which has some foundation in the evidence, "even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Lehman,* 468 F.2d 93, 108 (7th Cir. 1972), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232. See also *United States v. Grimes,* 413 F.2d 1376 (7th Cir. 1969). The testimony of Bush and Hillsman clearly raised a factual question as to whether the defendants reasonably believed Rhodes to be a fleeing felon. The issue becomes, therefore, whether, given the particular facts of this case, a reasonable mistake of fact as to Rhodes' status would be a defense to a prosecution under § 111. The issue, of course, is double-pronged as the tendered instruction involved belief as to Rhodes' status as (a) a federal agent and (b) a fleeing felon.

The Supreme Court has recently held, in a decision rendered after the trial in the present case, that a person may be criminally liable under § 111 for assaulting a federal officer, even though he did not know that his victim was a federal officer. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). "All the statute requires is an intent to assault, not an intent to assault a federal officer." At 684, 95 S.Ct. at 1264.

The assault in *Feola* was an intentional, unprovoked assault upon a person who, unbeknownst to the defendant, was a federal agent working undercover. The defendant in *Feola* did not claim that the assault itself was justified in the sense, for example, that it was done in self-defense or to protect another person from harm. Under these circum-

stances the Court concluded that, provided Feola intended to assault his victim, it was immaterial that the defendant was unaware of the status of his victim.

This interpretation of § 111, the Court noted, poses "no risk of unfairness to defendants" or "snare for the unsuspecting." At 685, 95 S.Ct. at 1264.

For in the case of an intentional, unjustified assault, such as was present in *Feola*, the defendant may be surprised to find that his victim is a federal officer, but the defendant

"nonetheless knows from the very outset that his planned course of conduct is wrongful. *The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected.* In a case of this kind the offender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." At 685, 95 S.Ct. at 1264. (Emphasis added).

The Court in *Feola*, however, carefully distinguished the unjustified-assault situation from the situation where a defendant was unaware that the other person was a federal agent and the agent's actions were such that the defendant would have been justified in using force against the agent had the agent, in fact, been a private citizen. In the latter situation the defendant's lack of knowledge of the agent's status negates the *mens rea* necessary under § 111.

"We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea*. For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent." At 686, 95 S.Ct. at 1264.

See also *United States v. Perkins,* 488 F.2d 652 (1st Cir. 1973), *cert. denied,* 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974); *United States v. Young,* 464 F.2d 160 (5th Cir. 1972); *United States v. Goodwin,* 440 F.2d 1152 (3d Cir. 1971).

■ In short, then, where a defendant charged with violating § 111 claims that he was unaware that the victim was a federal officer, the question becomes: would the defendant have been justified, because of the agent's actions, in using force against the agent had the latter, in fact, been a "civilian." If the defendant made an honest mistake of fact with respect to the agent's status and the defendant's use of force would have been justified against a private citizen, then he cannot be held criminally liable under § 111. For to hold him liable would create a situation "where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected." 420 U.S. at 685, 95 S.Ct. at 1264. If, on the other hand, the defendant would not have been justified in using force against a private citizen or if the defendant used more force than the law permitted, see *United States v. Perkins, supra,* his mistake as to the agent's status would be no defense to an action under § 111.

■ We turn, therefore, to the question of whether, assuming *arguendo,* that Hillsman and Bush were attempting to make a citizen's arrest, the actions of the defendants would have been justified had Rhodes been, as they allegedly believed, a private citizen. Since the incident would have been governed by Indiana law if Rhodes had been a private citizen, we look to the law of that state in making this determination.

■ Indiana follows the general common law rule that "a private citizen has the right to arrest one who has com-

mitted a felony in his presence, and may even arrest one he reasonably believes to have committed a felony, so long as the felony was in fact committed." *Surratt v. Petrol, Inc.,* Ind.App., 312 N.E.2d 487, 495 (1974). See also *Smith v. State,* 258 Ind. 594, 283 N.E.2d 365, 367 (1972); *Knotts v. State,* 243 Ind. 501, 187 N.E.2d 571, 574 (1963); *Doering v. State,* 49 Ind. 56 (1874). Where a felony of violence has been committed, moreover, a private citizen may use reasonable force, including deadly force, to prevent the felon's escape from the scene. *Burns v. State,* 192 Ind. 427, 136 N.E. 857 (1922); *Kennedy v. State,* 107 Ind. 144, 6 N.E. 305 (1886); *Surratt, supra* at 496.

■ The private citizen's right to make an arrest, however, is limited by the fact that he, unlike a police officer, acts at his own peril. A police officer has the right to arrest without a warrant where he reasonably believes that a felony has been committed and that the person arrested is guilty, even if, in fact, no felony has occurred. A private citizen, on the other hand, is privileged to make an arrest only when he has reasonable grounds for believing in the guilt of the person arrested and a felony has *in fact* been committed. *Smith, supra; Doering, supra; Teagarden v. Graham,* 31 Ind. 422 (1869). See also Restatement (Second) of Torts § 131 (1965).[5]

■ In the present case, the proffered defense instruction in question contained an incomplete statement of the law regarding a citizen's arrest and, therefore, did not accurately state a *Feola* mistaken-belief defense. The instruction tendered by the defendants stated that Hillsman and Bush should be found not guilty if they reasonably believed Rhodes to be a private citizen and reasonably believed that he had committed a felony. Under *Feola,* however, a mistake regarding the status of the victim is alone not a sufficient defense to a § 111 prosecution; rather, the mistake as to the victim's status must be coupled with actions which would have been justified had the victim in fact been a private citizen. And, as explained, Hillsman and Bush would have been justified in making a citizen's arrest only if they reasonably believed that Rhodes had committed a felony *and* a felony had in fact been committed.

The instructions actually given to the jury, on the other hand, while perhaps not a model of exhaustiveness of the subject, did adequately inform the jury of the requirements of a valid defense. The district court, not having the *Feola* decision to guide it, admittedly did not mention the possibility that the defendants had made a mistake of fact as to Rhodes' status. In light of the other instructions given and the peculiar facts of this case, however, we are of the opinion that notwithstanding this failure the jury was adequately instructed as to the particular defense.

As explained, in order to acquit Hillsman and Bush on the basis of a *Feola* mistaken-belief defense, the jury would have had to find both a mistake of fact as to Rhodes' status and an otherwise valid citizen's arrest. The trial court did instruct the jury in detail with regard to the right of a private citizen to make an arrest without a warrant. This instruction accurately stated that although deadly force could be used to effect such an arrest in an appropriate case, no citizen's arrest would be valid unless a felony had in fact been committed.[6] And

---

5. The fact that one defendant, Bush, did not actually see Rhodes shoot Griffin, see note 4, *supra,* is irrelevant. It has been held in Indiana that a private citizen may arrest a party if a felony has in fact been committed and there were reasonable grounds for suspicion, even though the citizen did not actually see the felony being committed. *Smith v. State, supra,* at 367.

6. The instruction stated:

"A private citizen is privileged to arrest another without a warrant for a felony which has been committed in his presence. If no felony has been committed, one not a peace officer is not privileged to make an arrest even though he reasonably suspects that a felony has been committed. The priv-

although the district court instructed the jury that the Government did not have to prove that the defendants knew Rhodes to be a federal officer, the instructions made it clear that a proper citizen's arrest would be a valid defense to the charges.

■ In addition, the district court instructed the jury with respect to the question of whether a felony had occurred when Rhodes shot Hanyard and Griffin. The jury was expressly told that if they found that a felony had occurred, then they could apply the law of citizen's arrest. The court admittedly instructed the jury with respect to only one type of felony, voluntary manslaughter.[7] This, however, was the only felony for which the defense requested an instruction and the defense does not contend on appeal that instructions on other felonies were necessary. Although it may be argued that a jury could have found that Rhodes committed a felony other than voluntary manslaughter, we cannot say that the district court's failure to instruct on other felonies, in the absence of any request by the defendants, was plain error requiring reversal.

The instruction on voluntary manslaughter was phrased in terms of whether Rhodes had committed that felony. Under a strict *Feola* analysis, the proper issue was whether a private citizen, who acted as Rhodes did, would be liable for voluntary manslaughter. In this case, however, this is a distinction without a difference. A law enforcement officer is on an equal footing as the private citizen with respect to voluntary manslaughter; the officer has no right, due to his office, to commit such a felony when a third person is attacked. Thus, given the rather unusual circumstances of this case, the possibility that the defendants were mistaken as to Rhodes' status was less central to their defense than the issue of whether they had the right to make a citizen's arrest, a matter which, in turn, depended upon whether a felony had, in fact, been committed. For if Rhodes had in fact committed voluntary manslaughter, the defendants would presumably have had the right to make a citizen's arrest, even if

---

ilege of a private citizen to make an arrest is not equivalent to the privilege of a peace officer to make an arrest. A peace officer may effect an arrest if he reasonably believes a felony has been committed even though in fact no such act or omission has been committed. A private citizen does not have that privilege and a private citizen's arrest is authorized only if an act or omission which constitutes a felony has actually been committed. A citizen's arrest is not justified if the act or omission which prompts the arrest is not a felony.

"The authority for the use of deadly force to effect an arrest is concomitant with the authority to make the arrest. The use of deadly force by a private citizen is not justified when the citizen has no privilege to make the arrest. A private citizen who attempts to arrest on the suspicion that a felony has been committed acts at his own peril and the use of deadly force will not be justified unless it is established that a felony had actually been committed

"In making a citizen's arrest for a felony committed, the act relied upon as constituting an arrest must be performed with the intent to effect an arrest and must be understood by the party arrested. Even if it is established that a felony has been committed, it is still necessary to determine whether sufficient notice of the intent to arrest was given to the party arrested."

7. The instruction stated:

"The crime of voluntary manslaughter is defined by statute in the State of Indiana as follows:

'Whoever voluntarily kills any human being without malice, express or implied, in a sudden heat, is guilty of voluntary manslaughter.'

"If, from the evidence, in this case you find that Kenneth Rhodes committed the crime of manslaughter in the presence of the defendants and was fleeing from the scene of the commission of said crime in order to avoid arrest and apprehension, and the defendants gave chase as to Agent Rhodes in order to avoid his flight from the scene and detain him for arrest apprehension, then you may apply the law that a private individual may make a citizen's arrest of the fleeing felon."

they had known Rhodes to be a federal agent.

■ In sum, then, the defendants could not rely, in presenting a *Feola* mistaken-belief defense, solely on their alleged mistake of fact as to Rhodes' status. An equally if not more important part of such a defense was the issue of whether the defendants had the right to make a citizen's arrest, a matter on which the district court adequately instructed the jury. Since the jury found against the defendants on the citizen's arrest issue, the failure to mention the possibility of a mistake of fact as to Rhodes' status does not vitiate the adequacy of the instructions given nor require reversal because of the refusal to give the tendered instruction.

## IV

Finally, the defendants contend that the district court erred in admitting certain impeachment testimony presented by the Government.

Cora Todd, a defense witness, testified that she was standing near Rhodes and Munson when Rhodes fired his gun and that she did not hear either Rhodes or Munson announce that he was a federal officer. The Government called as a rebuttal witness Thomas Feliciano, a Gary police officer. Officer Feliciano testified that after the shooting, he took a joint statement from three witnesses, Cecelia Willis, Cora Todd, and Cornelia Rondo, with Ms. Willis acting as the spokeswoman for the three. One question which was asked of the three women in the course of taking the statement, according to Feliciano, was whether the individual who fired the gun at Hanyard identified himself. Feliciano testified that Ms. Willis answered that the man "hollered something about being a police officer."

The defendants' primary contention appears to be that this was improper impeachment testimony because it concerned only a statement by Ms. Willis who was not a witness and not a statement made by Ms. Todd. On cross-examination, however, Ms. Todd admitted being present in the room when Ms. Willis was explaining what happened at the funeral home and admitted signing the statement given by Ms. Willis. Ms. Todd also admitted on cross-examination that she and the two women were given an opportunity to read the statement and to make corrections to it before signing it. Moreover, according to Officer Feliciano, while Ms. Willis was giving the statement, Ms. Todd repeatedly stated, "Yes, that's right."

■ Where a prior inconsistent statement is used to impeach a witness, the prior utterance may be in the form of a joint statement which the witness signed. 3A Wigmore, Evidence § 1040 (Chadbourn rev.1970). As Professor Wigmore points out, "If the statements did not accurately represent his own beliefs, [the witness] may absolve himself by explanation." *Id.*

■ In the present case, the district court correctly found that the statement given to Officer Feliciano was a joint statement of all three women. Officer Feliciano's testimony could, therefore, properly be used to impeach Ms. Todd.

Affirmed.

TONE, Circuit Judge (concurring).

While I concur in the court's opinion, I feel constrained to say a few words about the question decided by Part III of that opinion.

The majority in *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), held that "the 'federal officer' requirement" in 18 U.S.C. § 111 is "jurisdictional only" (95 S.Ct. at 1260 n. 9), *i. e.,* that by enacting that statute, in the words of Mr. Justice Stewart's dissent, "Congress intended merely to federalize every assault which

happens to have a federal officer as its victim." (*Id.* at 1270.) It seems to follow inexorably from this that, as the court holds today, the criminality of the use of force against one who turns out to be a federal officer depends upon whether the act is legally justified under the law of the state in which the act occurred. Thus the *mens rea* referred to in the passage from the *Feola* opinion quoted by Judge Pell is the *mens rea* necessary for the state offense, as is illustrated by the example given by the Court, in which the use of force against the person would be legally justified under state law.

I am uncomfortable in holding a defendant criminally accountable for conduct which, we hypothesize for present purposes, he thought was not only lawful but socially desirable, and I am made more so because the penalties provided by the statute are so harsh as to suggest that Congress did not contemplate their imposition on persons who did not believe they were committing a wrong. The defendants here were each sentenced to nine years imprisonment. The severity of the sentences indicates that the judge did not believe they were merely trying to apprehend a felon, but the jury might have found otherwise. This case demonstrates the harsh results that can be produced by transplanting the state laws of criminal assault and citizen's arrest into a federal criminal statute which does not distinguish between unknowing assaults and knowing assaults and punishes one as harshly as the other.* See Mr. Justice Stewart's dissent in *Feola,* 95 S.Ct. at 1276. I concur in Part III of the court's opinion in the case at bar only because I believe *Feola* requires that result. If I were free to do so, I would hold otherwise.

---

* As Mr. Justice Stewart states in his *Feola* dissent, the typical state assault statute makes an assault on a private citizen a misdemeanor and an assault on a law enforcement officer a felony, but "the accused's knowledge that his victim had an official status or function is invariably recognized by the States as an essential element of the aggravated offense." 95 S.Ct.

at 1270–1271. Indiana appears to be no exception. The offense of the defendants in the case at bar, if committed against a state officer, would have been a misdemeanor under Ind.Code 35–13–5–7 unless they knew the victim to be a law enforcement officer, in which case it would have been a felony under Ind. Code 35–21–4–2.