Kenneth EAGLIN, Petitioner–Appellee,

v.

George C. WELBORN and Roland W. Burris, Respondents–Appellants.

No. 93–1561.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1993.

Decided Oct. 28, 1994.

Rehearing and Rehearing En Banc Granted, Opinion Vacated Jan. 23, 1995.

Maribeth Egert Dura (argued), Faupel & Corrigan, Peoria, IL, for petitioner-appellee.

Penelope Moutoussamy George (argued), Office of the Atty. Gen., Crim. Appeals Div., Chicago, IL, for respondents-appellants.

Before CUDAHY and ROVNER, Circuit Judges, and WILL, District Judge.*

## OPINION

WILL, District Judge.

This is an appeal from the District Court's grant of Eaglin's petition for a writ of habeas corpus. The facts are largely undisputed.

## FACTS

Petitioner, Kenneth Eaglin, was convicted in 1990 by a jury of solicitation of murder for hire and sentenced to 34 years imprisonment. At trial, he sought both to deny that he had knowingly committed the crime and also to assert the defense that his actions were the product of entrapment by a police informant and a police officer.

The state court trial judge, relying on the Illinois Supreme Court's decision in *People v. Gillespie*, 136 Ill.2d 496, 145 Ill.Dec. 915, 557 N.E.2d 894 (1990), refused to instruct the jury on the entrapment defense because Eaglin was also denying that he had any intent to kill, one of the essential elements of the crime charged, and, therefore, was denying that he had committed the crime.

The Illinois Appellate Court affirmed the conviction holding that Eaglin was not entitled to the entrapment instruction, again on the basis of the Illinois Supreme Court's holding in *Gillespie. People v. Eaglin,* 224 Ill.App.3d 668, 167 Ill.Dec. 8, 586 N.E.2d

1280 (3d Dist.1992). Rehearing was denied on March 6, 1992. A petition for leave to appeal to the Illinois Supreme Court was denied on June 3, 1992. The petition for a writ of habeas corpus was granted by the District Court on February 24, 1993, 815 F.Supp. 1181. For the reasons stated herein, we affirm the grant of the writ.

The facts with respect to the events leading up to Eaglin's being charged are also largely undisputed. Much of the state's evidence was the testimony of the informant, Joseph Roberts, who had started working part time at Eaglin's construction company in April 1990. Roberts, then age 21, had previously been at least twice convicted of felonies, had served time in jail and, at the time of the events here involved, faced two Petitions to Revoke Probation with respect to prior convictions.

During this time, Roberts and Eaglin had several conversations regarding their mutual custody problems involving their children and the authorities, the Fulton County State's Attorney, Joan Scott, and the Illinois Department of Children and Family Services. Roberts testified that on or about June 27, 1990, he told Eaglin's wife that there was a hit man who had been hired to kill her. Mrs. Eaglin separately testified to this conversation stating, "[Roberts] said that someone was going to pay a hit man $10,000 to gun me down.... And Joe told me that it was as a warning to my husband to back off, because he knew too much about someone at the courthouse here in Fulton County." R. 1010. Roberts also conveyed these threats to Eaglin.

On the following day, June 28, Roberts met Eaglin and told him that he had contacted the hit man involved, a man named Paul Long. According to Eaglin, Roberts stated that he had learned that the Fulton County State's Attorney, Joan Scott, was the person responsible for the threats to Eaglin's wife and family.

Roberts also allegedly told Eaglin that State's Attorney Scott had hired Long to kill

* The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

his wife. Long was purportedly a former cellmate of Roberts, but there is no evidence that Roberts ever talked to him about, or that he was actually aware of, any of the circumstances described here.

Eaglin testified that, when Roberts identified Scott as the person who had hired a hit man to kill Mrs. Eaglin, he asked:

Why would Joan Scott, a State's Attorney who is supposed to uphold the law, want to kill my wife?

R. 1068. Roberts, Eaglin testified, said that Scott wanted "to get even" and to make Eaglin "worm and squirm," that he had been a travesty to justice in the county and she had not been able to convict him. Eaglin testified that out of fear for his family's safety, he told Roberts to contact Long to keep him from harming his wife.

The next day, on June 29, 1990, Roberts told Eaglin that he had made a deal with Long. The deal was that Long would kill Scott instead of Mrs. Eaglin. Eaglin told Roberts he did not want Scott killed, he simply wanted Roberts to "arrange for my family not being killed, not to kill Joan Scott." Roberts then responded:

What are you trying to do, get us both killed.... Once you make a deal with these people, ... there is no backing out.... If he thinks you're going to back out, he will kill you and me, not a hesitation.

R. 1072. Roberts then informed Eaglin that Long wanted $5,000. Eaglin testified:

[Roberts] wanted $5,000. I told him I did not have $5,000. He said, "Isn't your wife's life and yours worth it. Can't you sell some stuff or borrow the money or get it in some way.... You know, if he doesn't get to you, your wife eventually or you," he says, "Then he would come back and kill your kids."

R. 1073.

Between the meeting on June 29, 1990 and July 12, 1990, Roberts persistently attempted to get the $5,000 from Eaglin, in order ostensibly to pay Long. Crystal Wilson King testified that she had lived with Joe Roberts and that Roberts telephoned Eaglin daily. She stated that during one of the phone conversations, Roberts "told Kenny that if he tried to back out of the deal with this hit man, that him, his wife and kids would be killed." R. 948.

Having received no money from Eaglin, on July 12, Roberts telephoned Officer Daniel Daly of the Fulton County Sheriff's Department. He told Daly that Eaglin was planning to have State's Attorney Scott killed. He further stated that Eaglin had inquired whether Roberts knew of anyone who could commit the crime. Roberts stated that he had volunteered Long's name and that Eaglin had reportedly discussed payment and inquired about the length of time Long would need to prepare.

On July 26, 1990, at the request of law enforcement officials, Roberts went to Eaglin's house and told Eaglin that the hit man was ready to proceed. At Roberts' request, Eaglin provided Roberts with a photo of State's Attorney Scott which had been clipped from a newspaper and which Roberts knew Eaglin had. This conversation was recorded via an eavesdropping device which was hidden on Roberts.

The next day, again at the request of the police, Roberts telephoned Eaglin. He told Eaglin that the hit man Long wanted to talk to him. Roberts then handed the phone to Gerald Kempf, a deputy sheriff who purported to be Long. Eaglin never stated in the conversation that he wanted Scott dead but kept saying "Do what you want. I don't care." R. 1091. He also agreed to pay Kempf alias Long $2,000 in the hope, he testified, that Long would refuse to kill Scott for only $2,000 which would end the matter. He also testified, "I can't imagine anyone taking a life for $2,000, sir," R. 1092, an understandable belief since, if apprehended, the hit man would certainly face the death penalty. He further testified that he was surprised when the pseudo hit man agreed. Kempf described Eaglin in the conversation as "confused." This conversation, which was also recorded, was the basis for the solicitation charge.

In the conversation, Kempf alias Long and Eaglin arranged to meet in a parking lot. They met. No money was exchanged but

after a short conversation, Eaglin was arrested.

The State's theory as to why Eaglin had sufficient animosity towards Scott to contract for her murder was that she had attempted to remove his and his wife's children from his household under charges of neglect. These custody controversies involving Scott and the Illinois Department of Children and Family Services started in 1987 and included the filing by Scott of perjury charges against both Eaglin's wife and his parents and the brief imprisonment of Mrs. Eaglin on a contempt charge. Finally, an effort was being made at the time of the events here involved to terminate his and his wife's parental rights and make the children available for adoption.

On the basis of the foregoing facts, Eaglin asked the trial judge, in addition to the other instructions, to give an instruction on the defense of entrapment. That request was refused, not on the ground that the evidence was insufficient to warrant a jury finding entrapment but on the ground that Eaglin had "clearly denied on several occasions that he ever intended that the victim be murdered," and thus, under *Gillespie,* entrapment was not to be considered as an instruction to be given to the jury in Illinois.

## DISCUSSION

■ In his petition for a writ of habeas corpus, Eaglin asserted four grounds: (1) his Fourteenth Amendment right to due process had been violated when the trial court refused to instruct the jury on the defense of entrapment; (2) his Fourteenth Amendment right to due process was violated because the trial court's instruction defining first degree murder stated that the defendant must either have intended to kill or do great bodily harm; (3) his Fourteenth Amendment right to a fair and impartial trial was violated when the trial judge removed Joan Scott, the Fulton County State's Attorney, as the prosecutor because of an obvious conflict of interest and appointed Kevin Lyons, the Peoria County State's Attorney, as a special prosecutor without any authority to do so; and (4) his Fourteenth Amendment right to due process was violated because the rule requiring that a defendant admit to committing a crime as a precondition to asserting an entrapment defense violates his privilege against self-incrimination and his right to the presumption of innocence throughout every stage of his trial.

■ The District Court found that the first ground established a constitutional violation, granted the writ on that ground and did not reach the other three.[1] In reaching its conclusion, the court relied on two cases, *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1987) and *Whipple v. Duckworth,* 957 F.2d 418 (7th Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 218, 121 L.Ed.2d 157 (1992).

In *Mathews,* the issue was whether "a defendant in a federal criminal prosecution who denies commission of the crime may nonetheless have the jury instructed, where the evidence warrants, on the affirmative defense of entrapment." *Mathews,* 485 U.S. at 59, 108 S.Ct. at 884–85. The Supreme Court held that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* at 62, 108 S.Ct. at 886. The Court specifically discussed the possible inconsistency between a denial of one or more necessary elements of the crime and an entrapment defense, and held that such inconsistent defenses should be permitted where the evidence warranted it. This is clearly such a case.

The Supreme Court in *Mathews,* however, did not identify any United States Constitutional provision or provisions as the basis for its holding, but instead, it being a federal criminal case, based its decision on federal common law. On this ground, the Illinois Supreme Court in *Gillespie* held that *Mathews* does not compel state courts to follow it.

In *Whipple,* however, we noted that "[t]his Court has firmly established that under the Fifth and Sixth Amendments a criminal de-

---

**1.** Like the District Court, we do not reach the other three grounds for habeas corpus relief urged by Eaglin although inferentially at least our holding is relevant to the fourth ground.

fendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." 957 F.2d at 423 (quotations and citations omitted). In that case, we specifically held that a defendant has a right that is fundamental to a fair trial under the Fifth and Sixth Amendments to assert "a defense for which he has an evidentiary foundation." *Id.*

■ An entrapment defense requires evidence that (1) the alleged crime was induced by the government and (2) there was a lack of predisposition on the part of the defendant to commit the crime charged. *Mathews,* 485 U.S. at 63, 108 S.Ct. at 886–87. Since there was no actual hit man here involved, Roberts originally was apparently on a money-making venture of his own, pressuring Eaglin in a series of conversations in which he asserted that the lives of Eaglin, his wife and family would be in serious jeopardy if he did not agree to pay $5,000 to the purported hit man who initially Roberts had said had been hired for $10,000 to murder Eaglin's wife. Eaglin asked him to do what he could to prevent Long, a former cellmate of Roberts and the purported hit man, from harming his wife.

The next day Roberts told Eaglin that he had made a deal with Long, who there is no evidence Roberts had ever talked to or was aware of any of Roberts' statements or actions. Under the deal, Eaglin would ostensibly pay Long through Roberts $5,000 and the latter would kill State's Attorney Scott. As the record shows, Eaglin immediately protested that he did not want Scott killed and, as the trial judge found, repeatedly testified that at no time did he want Scott killed. He gave Roberts no money although the latter vigorously asserted that, if he didn't pay $5,000, Eaglin, his wife and family and he, Roberts, might all be killed by the hit man, Long, or his accomplices.

After it became apparent to Roberts that Eaglin could not or would not pay the $5,000, he contacted the local sheriff's office. That office then became involved to the point where a deputy sheriff, Gerald Kempf, represented to Eaglin both on the phone and in person that he was the hit man Long, and endeavored to get Eaglin to pay him money or otherwise incriminate himself as a willing participant in the fictitious scheme to murder Scott. Eaglin paid no money to Kempf alias Long and never stated to him that he wanted State's Attorney Scott killed. Despite the fact that Eaglin believed he was talking to a real hit man whom, based on Roberts' assertions, he also believed would kill him, his wife and his family if he did not pay to have State's Attorney Scott killed, the most he said was "Do what you want. I don't care."

■ This case is a classic example of life being stranger than fiction. It has both Catch–22 and Kafkaesque qualities. The refusal to allow Eaglin to assert both that he had not sought to have anyone killed and therefore was not guilty of the crime charged, and that any of his arguably incriminating acts or statements were induced by entrapment, was a form of Catch–22. Either he had to admit that he was guilty as charged or he could not assert the defense of entrapment. As we have previously held in *Whipple,* and, as the District Court found, such a refusal deprives a defendant of the right to submit any defense for which he has an evidentiary foundation. In this case, it violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to a fair trial.

As previously discussed, Eaglin clearly had substantial evidence to support both defenses. The refusal to permit him to assert both and the refusal to instruct the jury on both defenses violated both the Fifth and Sixth Amendments.

A look at the basic undisputed facts is revealing. There never was a real hit man. Accordingly, there never was a real scheme to kill anyone. Not a scheme to kill Mrs. Eaglin as Roberts first reported, nor one to kill State's Attorney Scott. Nor was there any real threat to the lives of Eaglin, his family or Roberts, notwithstanding the latter's assertions about what Long, the purported hit man would do. All of these were fictitious creations of Roberts and figments of his imagination.

Eaglin never paid a penny to have anyone killed or stated to the purported hit man, Deputy Kempf alias Long, that he wanted State's Attorney Scott killed. On the contrary, he stated on a number of occasions that he did not want her or anyone else, including himself and the members of his family, killed.

Roberts' conduct is almost inexplicable. He was an ex-convict whom Eaglin had given a job and was helping try to find a better one. Eaglin had lent him money, lent him vehicles for transportation, helped him fix up the residence which he shared with Ms. King and done him other favors.

Eaglin not only befriended but obviously trusted Roberts and believed all of his fictional misrepresentations. This was clearly bad judgment. Notwithstanding, he fortunately did not pay Roberts any money for transmittal to the reputed but fictitious hit man. If he had, it is clear, since there was no real hit man, that the money would have gone into Roberts' pocket and Roberts would have accomplished a fool-proof fraud. Eaglin obviously could not have sued him civilly and it is equally obvious that he could not have asked the State's Attorney to indict Roberts for fraud on the ground that he had paid him money to have her killed and she was still alive.

Nor did Eaglin pay the fictitious hit man, Kempf alias Long, any money or ask him to kill the State's Attorney. Yet Eaglin was convicted of soliciting Kempf alias Long to kill Scott largely on the testimony of Roberts whom he had befriended and he sits today in the penitentiary serving a 34–year sentence. Franz Kafka could have made much of this scenario.

■ The State contends first that the grant of habeas corpus relief to Eaglin is proscribed by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), since the Supreme Court's analysis in *Mathews* and our holding in *Whipple* constituted a "new" rule under *Teague* not dictated by precedent at the time Eaglin's conviction became final. In this connection, it contends that *Mathews,* decided in 1987, although clearly holding that a defendant was entitled to assert possibly conflicting defenses and

specifically to deny an essential element or elements of the crime and at the same time assert the defense of entrapment was not predicated on federal constitutional grounds and accordingly did not mandate state courts to follow its holding.

*Whipple,* however, clearly established that under the Fifth and Sixth Amendments defendants are entitled to jury instructions regarding any defense if that defense has some foundation in the evidence. Since *Whipple* was decided more than three months before Eaglin's conviction became final, *Teague* is inapplicable. Regardless of the basis of the holding in *Mathews,* this Circuit's decision in *Whipple* is controlling.

As to our decision in *Whipple,* the State contends it has been "effectively invalidated" by *Gilmore v. Taylor,* — U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). But *Gilmore* did not involve an entrapment defense and a denial of guilt nor our holding in *Whipple.* On the contrary, it involved our holding in *Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990), which substantially preceded *Whipple* and which held that the Illinois pattern jury instructions on murder and involuntary manslaughter were unconstitutional because they allowed a jury to return a murder verdict without considering whether the defendant possessed a mental state that would support a voluntary manslaughter verdict instead.

The Supreme Court held that the rule we announced in *Falconer* was not dictated by prior precedent and was therefore "new" within the meaning of *Teague* and accordingly could not provide any basis for habeas relief to Taylor whose state conviction became final eleven days before our decision in *Falconer.* How that holding "effectively invalidated" *Whipple,* which was decided March 3, 1992, three months prior to the Illinois Supreme Court's June 3, 1992 denial of Eaglin's petition for leave to appeal is difficult to understand and the State does not explain. Since *Gilmore* did not address whether a defendant was entitled to present a defense based upon the Fifth or Sixth Amendments, it clearly does not affect our holding in *Whipple.*

■ The State's second contention is that, since Eaglin asserted that his Fourteenth Amendment right to due process had been violated, the District Court erred in granting the writ on the basis that his Fifth and Sixth Amendment rights had been violated. The State also contends that, in any event, Eaglin's due process rights were not violated. The District Court considered and rejected the State's contention that, because Eaglin had predicated his constitutional claim on the Fourteenth Amendment due process clause, he could not obtain relief for a violation of his Fifth and Sixth Amendment rights. As the court pointed out, the operative question is whether or not the state courts were "fairly alerted" that a constitutional issue was involved. *See Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Verdin v. O'Leary,* 972 F.2d 1467, 1474 (7th Cir.1992); *Whipple v. Duckworth,* 957 F.2d 418 (7th Cir.1992).

In *Whipple,* we stated that petitioners are not required to cite the exact constitutional provisions on which they rely. In that case, the petitioner did not identify any particular constitutional grounds. We held, nevertheless, that because he relied on cases that raised the same constitutional questions, he was entitled to relief even though he had not identified the Fifth and Sixth Amendments as the basis for his claim.

■ Here, Eaglin asserted a constitutional deprivation under the due process clause. We held in *Whipple* that almost identical facts constituted a violation of Amendments Five and Six. The rights not to incriminate oneself and to a fair trial are inherent in due process. The District Court correctly refused to deny Eaglin's petition simply because he failed correctly to identify the exact constitutional source of his right both to defend and to have an instruction on entrapment.

The State's next contention is that a state has no constitutional obligation to permit a defendant to plead an affirmative defense such as entrapment in the first place and therefore Eaglin suffered no constitutional deprivation when he was denied the opportunity to do so. This contention is clearly inconsistent with our holding in *Whipple* and logically inconsistent with the Supreme Court's holding in *Mathews.*

■ Finally, the State contends that any error in the failure to give an entrapment instruction was harmless beyond a reasonable doubt "in light of the evidence and the absurd nature of petitioner's claim." Br., p. 17. The State then goes on to quote at length that portion of Eaglin's testimony in which he repeats several times that he did not want State's Attorney Scott killed but only wanted to protect against his family being killed. It also refers to Eaglin's statement that he had not told Deputy Kempf alias Long that he wanted Scott killed because in fact he did not want her dead or did not want her killed.

The State concludes this contention with the statement "If the jury had believed petitioner he would not have been convicted. The error, if any, was harmless." Br., p. 8. This misses the point. If the jury had been instructed on entrapment and Eaglin's counsel permitted to argue that his statements and conduct were induced by the false representations as to Scott's conduct and the false threats of bodily harm reputedly made by Roberts which were subsequently aided and abetted by Deputy Kempf alias Long, it might not have believed Eaglin's statements that he did not want Scott killed while at the same time believing that he had been induced by those misrepresentations by state agents to agree to Scott's death.

It is by no means clear that the refusal to permit Eaglin to assert the defense of entrapment and have the jury instructed thereon was harmless error. On the contrary, there was substantial evidence to support the conclusion that whatever incriminating acts and statements Eaglin did or made were the result of the police informant's persistent, aggressive and terrorizing false statements about the danger Eaglin, his wife and family were in, the need for him to pay Roberts $5,000 to give to Long and State's Attorney Scott's alleged role in the matter. These were confirmed at least in part by the statements of Deputy Kempf while impersonating Long, the alleged hit man in the case.

If the jury had been instructed on entrapment, it might well have arrived at a different verdict.

The State will have to determine whether or not to retry Eaglin without the Catch–22 dilemma. Given the facts, it is difficult to see how the ends of justice will be served by such a retrial.

## CONCLUSION

The grant of the writ of habeas corpus is affirmed and the case remanded to the district court for further action consistent herewith including setting a reasonably brief time for the State to retry Eaglin if it decides to do so and determining whether or not Eaglin should be enlarged pending any such retrial.

CUDAHY, Circuit Judge, concurring in the judgment:

If *Whipple v. Duckworth,* 957 F.2d 418 (1991), correctly reflects the law of this Circuit, I must agree with the majority that the trial court erred in refusing to give the jury an instruction on entrapment. This does not mean that *Whipple* "constitutionalized" *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), as Judge McDade apparently held. Given Justice White's dissent and the other indicators discussed below, *Mathews* was not a constitutional decision. *Whipple,* however, did declare the much broader principle that "[The Seventh Circuit] has firmly established that under the Fifth and Sixth Amendments 'a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him.'" 957 F.2d at 423. *Whipple* also relied on *Mathews* to support its conclusion.

But *Mathews* stands for the proposition that as a matter of federal common law a defendant is entitled to jury instructions under certain circumstances (thus rendering the pre-*Mathews* entrapment rule archaic). As noted by both Justice White's dissent and later, by the Illinois Supreme Court, *People v. Gillespie,* 136 Ill.2d 496, 145 Ill.Dec. 915, 557 N.E.2d 894 (1990), *Mathews* is *not* of constitutional magnitude. The cases that *Mathews* relies on state propositions of federal common law. *See Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896) (discussing the federal crime of murder in then-Indian territory). Therefore, *Mathews* itself enunciates a rule of federal common law that states are not obliged to follow.

Prior to *Whipple,* this Circuit merely followed the federal common law rule. As a general matter, a defendant was entitled to a jury instruction on any defense that provided a legal barrier to the charge against him. *United States ex rel. Peery v. Sielaff,* 615 F.2d 402, 403 (7th Cir.1979); *see also United States v. Creamer,* 555 F.2d 612, 616 (7th Cir.1977) (non-constitutional case stating general proposition); *United States v. Hillsman,* 522 F.2d 454, 459 (7th Cir.1975) (same). This rule was not, however, a constitutional mandate.

Because the failure to provide a certain instruction was not generally an error of constitutional magnitude, it did not ordinarily provide grounds for habeas relief. *Sielaff,* 615 F.2d at 404. Only when the judge evaluated or screened the evidence proffered— and based his decision about the propriety of a proffered instruction on his own view of the evidence—did he invade the province of the jury and offend the Sixth Amendment. *Id.* at 403–04. In *Sielaff,* this Court eventually held that the evidence of the suggested defense was not so "unequivocally strong" that a failure to give instructions on that defense amounted to constitutional error. *Id. Sielaff* thus laid down the rule that a judge's independent assessment of the evidence might offend the constitution. Failure to offer a jury instruction, without more, did not necessarily rise to the level of a constitutional violation though.

*Whipple* unfortunately seems to overlook *Sielaff's* fine distinctions. It suggests that *Sielaff,* along with *Mathews,* stands for the proposition that the failure to offer particular instructions offends both the Fifth and Sixth amendments. 957 F.2d at 423. *Whipple* further suggests that this rule was "firmly established" in this Circuit. *Id.* This seems questionable. None of the cases that *Whipple* relies on suggest that a failure to give certain instructions offends the Constitution.

*Sielaff* does not. *Mathews* does not. The remainder of the cases cited in *Whipple* do not (they are nonconstitutional and only restate the common law proposition about a defendant's general entitlement to instructions). *Whipple* therefore seems inadequately supported.

But, of course, it is not my function or the function of this panel to look behind *Whipple*. Further, I think the *Mathews* rule a wise one despite the State of Illinois's reluctance to follow it. *See Gillespie,* 145 Ill.Dec. 915, 557 N.E.2d 894. Taking *Whipple*—particularly on the facts of this case—at face value, I therefore join in the result reached by the majority.

## Order

### Jan. 23, 1995

The petition for rehearing with suggestion for rehearing en banc in the above-entitled case is GRANTED, the panel decision is VACATED, and the appeal is restored to the calendar for oral reargument before the full court at a date and time to be announced.