# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CT-00097-SCT

*SCOTT HERMAN BATES a/k/a HERMAN BATES*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2012 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | BRAD HUTTO |
| | GALE WALKER |
| | KEVIN CAMP |
| | MOLLY POOLE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KEVIN DALE CAMP |
| | JARED KEITH TOMLINSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/20/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1. Scott Herman Bates was convicted of simple assault of a law-enforcement officer in violation of Mississippi Code Section 97-3-7(1). Bates appealed his conviction, claiming he cannot be guilty of the enhanced crime of simple assault on a law-enforcement officer because the officer he assaulted, Deputy Sheriff James Cox, was working off-duty as a

private security guard. The Mississippi Court of Appeals affirmed Bates's conviction. **Bates v. State**, 2014 WL 3824038 (Miss. Ct. App. Aug. 5, 2014). The Court of Appeals found that, while Deputy Cox was working for a private restaurant the night the assault occurred, he was acting within the scope of his duty as a law-enforcement officer when Bates broke the law and shot at Deputy Cox. *Id*. at *1.

¶2.     Bates thereafter petitioned for writ of certiorari, which this Court granted on the question of whether there was sufficient evidence to support a finding that Deputy Cox was acting within the scope of his duty, office, or employment as a law-enforcement officer. Finding that State presented sufficient evidence to support the jury's finding, we affirm.

**FACTS**

¶3.     For purposes of certiorari review, we adopt the following facts from the Court of Appeals' opinion.

> [Deputy] Cox is a deputy with the Hinds County Sheriff's Department. During the summer of 2011, with his sheriff's approval, he moonlighted as a security guard at a Hinds County restaurant, Reed Pierce's, on Friday and Saturday nights.
>
> Bates was a patron one of those late weekend nights. On that night, last call had come and gone, and the wait staff was hanging around to divide up tips. Bates hung around too, talking to some of the staff and their friends. But because the manager did not know Bates, the manager told Deputy Cox to ask Bates to leave.
>
> Bates took exception to Deputy Cox's request, pointing out that other people were still at the restaurant. Even when Deputy Cox explained that those others could stay because they were either staff or friends of the manager, Bates refused to leave. Bates shouted at Deputy Cox, taunting him that only his uniform protected him from a beating at Bates's hands. Bates also bragged that he would work his connections with the Hinds County Sheriff's Department to get Deputy Cox fired. Only after two more security

2

guards stepped in did Bates succumb to being escorted out of the restaurant. Concerned that Bates may be up to something, Deputy Cox and the two other guards followed Bates into the parking lot.

Outside, Bates kept threatening to beat up Deputy Cox and ruin his law enforcement career. When Bates finally started walking towards his truck, Deputy Cox and the two guards held their position, keeping an eye on Bates. Instead of driving out of the parking lot, Bates drove towards Deputy Cox and the two other guards. He made a sharp turn so that his truck was broadside to them. He fired his gun, and then sped off.

Deputy Cox jumped into his marked vehicle and radioed that he was in pursuit of a man that had shot at him. He followed Bates to a nearby house. When more deputies arrived, they arrested Bates. In his truck, they found a .38 revolver and a spent shell casing.

Bates was charged with aggravated assault on a law enforcement officer. *See* Miss. Code Ann. § 97-3-7(2). During trial, after the court denied his motion for a directed verdict, Bates testified in his own defense. He admitted his gun went off in the parking lot but claimed it had been triggered by accident. At the end of trial, the State requested and was granted an instruction on the lesser-included offense of simple assault on a law enforcement officer. *See* Miss.Code Ann. § 97-3-7(1). Given the options of finding Bates guilty of aggravated assault on a law enforcement officer, guilty of simple assault on a law enforcement officer, or not guilty, the jury found Bates guilty of simple assault on a law enforcement officer. The court sentenced Bates to serve a term of five years. *See id*.

*Bates*, 2014 WL 3824038, at 1-2. Additional facts, as necessary, will be related in our discussion.

## DISCUSSION

¶4.    As the Court of Appeals found, the State was required to prove Bates (1) committed simple assault, (2) on a law-enforcement officer, (3) while the law-enforcement officer was "acting within the scope of his duty, office, or employment." *See* Miss. Code Ann. § 97-3-7(1)(b); 14(a) (Rev. 2014). Bates argued on appeal before the Court of Appeals that Deputy

3

Cox could not have been acting within the scope of his "employment" that night, based on the undisputed testimony that Deputy Cox was being paid by Reed Pierce's to work as a private security officer.

¶5. The Court of Appeals disagreed, finding first that Bates's indictment did not say Deputy Cox had been acting "with in the scope of his employment"; rather, it alleged that Deputy Cox had been acting "within the scope of his duty and office." *Bates*, 2014 WL 3824038, at *2. The jury instructions submitted to the jury at Bates's trial tracked the indictment accordingly. *Id*.

¶6. Next, finding no Mississippi case directly on point, the Court of Appeals surveyed other jurisdictions and found the consensus is that a law-enforcement officer's private employment as a security guard does not limit the officer's authority or responsibility to act within his or her official duties. *See id*. at *3, citing as follows:

> *S.D. v. State*, 11 So. 3d 401, 402 (Fla. Dist. Ct. App. 2009) ("A police officer can be engaged in the lawful performance of his duties when working an off-duty job."); *State v. DeSanto*, 172 N.J. Super. 27, 410 A.2d 704, 705 (1980) ("[T]he police uniform has the same significance to the public whether the wearer is technically on or off duty[, and] in such a situation[,] the municipality and its public expect and obtain real benefits from the police officer."); *Salt Lake City v. Christensen*, 167 P.3d 496, 501 (¶ 14) (Utah Ct. App. 2007) ("[W]hen a law enforcement officer responds to preserve law and order or to detect and deter crime, he is acting 'within the scope of his authority as a peace officer,' . . . even though he may be working at another job." (quoting Utah's assault statute)); *Davis v. Commonwealth*, 44 Va. App. 562, 605 S.E.2d 790, 792 (2004) ("[T]he coincidence of the officer's private and public duties during the encounter did not eclipse his authority and responsibility as a law enforcement officer."); *State v. Graham*, 130 Wash. 2d 711, 927 P.2d 227, 230 (1996) ("[P]olice officers are considered to be under a duty to respond as police officers 24 hours a day."). Instead, "a police officer retains his or her police officer status, even while off duty in a secondary employment capacity, unless it is clear from the nature of the

4

officer's activities that he or she is acting exclusively in a private capacity or is engaging in his or her own private business." **State v. Wilen**, 4 Neb. App. 132, 539 N.W.2d 650, 660 (1995) (emphasis added); *see also* **State v. Phillips**, 205 W.Va. 673, 520 S.E.2d 670, 681 (1999) (holding that an off-duty police officer employed as a security guard "retains his or her official police officer status even in the private employment, unless it is clear from the nature of the officer's activities that he or she is acting in an exclusively private capacity or engaging in his or her private business").

¶7.     Agreeing with this view,[1] the Court of Appeals reasoned as follows:

We find this common-law principle–that an officer retains his authority to carry out his official duties, even when privately employed–to be particularly true in Mississippi, where our Legislature has found that a law enforcement officer's employment as private security serves the public interest. Not only has the Legislature authorized certified law enforcement officers to perform private security services during off-duty hours, it also has permitted these officers to wear their official uniforms and carry their official weapons while privately employed—so long as the chief or sheriff has approved the private employment, based on a determination that the employment would serve the public interest. Miss. Code Ann. § 17-25-11 (Rev. 2012). While section 17-25-11 requires the private employer to assume any civil liability connected to the officer's act or omissions, the statute does not strip the officer of his authority to carry out his official duties, if necessary. Instead, the statute does the opposite by literally clothing the officer with the public symbols of his law enforcement authority–his official uniform and firearm. *Cf.* **Cagle v. State**, 536 So. 2d 3, 6 (Miss. 1988) (holding a municipal fireman responding to a car wreck was "acting within the scope of his duty" for purposes of the assault statute, based on a statute that "clothes fire departments, its personnel and equipment, with authority to travel beyond municipal boundaries to aid in the rescue of persons with or without the occurrence of a fire"); *see also* **Wilen**, 539 N.W.2d at 660 (holding that an uniformed officer "at the restaurant conveyed to the patrons the presence of law enforcement," creating a knowledge and expectation that the officer would act officially, if necessary); **DeSanto**, 410 A.2d at 705 (finding that "the police uniform has the same significance to the public whether the wearer is technically on or off duty").

_____

[1]"Under the common law, a police officer on 'off-duty' status is 'not relieved of the obligation as an officer to preserve the public peace and to protect the lives and property of the citizens of the public in general.'" **Graham**, 927 P.2d at 230 (quoting 16A Eugene McQuillin, *The Law of Municipal Corporations* § 45.15, at 123 (3d rev. ed. 1992)).

***Bates***, 2014 WL 3824038, at *3.

¶8.     We agree with the Court of Appeals.  The State presented evidence that, while working as a private security guard, Deputy Cox was in full uniform and working at the private establishment with the approval of his sheriff.  Miss. Code Ann. § 17-25-11 (Rev. 2010).  "While Deputy Cox's initial request that Bates leave was on behalf of Reed Pierce's, Bates's hostile reaction triggered Deputy Cox to switch into law-enforcement mode." ***Id***. at *4 (citing ***Christensen***, 167 P.3d at 500-01 (holding that evidence supported a conviction of simple assault on a law-enforcement officer because when the defendant became belligerent, the officer's role shifted from private security guard to peace officer); ***Phillips***, 520 S.E.2d at 674 (affirming conviction of assault on an off-duty officer who worked as a private security guard for Walmart and who had been called over to deal with a belligerent customer)).  Deputy Cox testified that at one point Bates went into a "fight[ing] stance" and "was acting like he wanted to fight at that time."  Concerned that Bates would do something to violate the peace or endanger someone, Deputy Cox followed Bates outside." ***Bates***, 2014 WL 3824038, at *4.  Deputy Cox testified that, "at that point, his services for Reed Pierce's had ended[,] [and he] was now acting as a sheriff's deputy." ***Id***.  Once outside, Bates repeatedly threatened to beat up Deputy Cox and ruin his law-enforcement career.  Deputy Cox testified that he was concerned that Bates was going to try and fight him.  And Deputy Cox contemplated arresting Bates at that time.  Because of recent medical issues, Deputy Cox said that he did not think he physically would have been able to handle Bates if Bates had tried to fight.  Deputy Cox decided not to arrest Bates because Bates finally started walking

6

toward his truck.  As Bates did so, he turned to Deputy Cox and continued making threats, such as "I'm going to get you.  You wait, I'm going to get you."  Bates got into his truck and drove toward Deputy Cox and the two bouncers.  Bates made a sharp turn so that his truck was alongside them.  Bates fired his gun and sped off.  Deputy Cox immediately ducked when he heard the shot.  Deputy Cox testified about how he felt during the incident: "It was just – a gun being shot after an argument and someone threatening me, it –  it scared me . . . I felt like he was trying to shoot at me."

¶9.     Like other jurisdictions, Mississippi permits certified law-enforcement officers to wear their official uniforms while in the performance of private security services in off-duty hours if the private-security endeavor is properly authorized and serves the public interest. Miss. Code Ann. § 17-25-11.  Georgia allows the same, and in speaking to a case very similar to the one before us, the Georgia Court of Appeals explained as follows:

> The practice of municipalities which allows law enforcement officers to serve, while off duty and in uniform, as peace-keepers in private establishments open to the general public is in the public interest. The presence of uniformed officers in places susceptible to breaches of the peace deters unlawful acts and conduct by patrons in those places.  The public knows the uniform and the badge stand for the authority of the government. The public generally knows that law enforcement officers have the duty to serve and protect them at all times.  A holding that law enforcement officers have no official duty to maintain the peace under these circumstances would be in contravention of th[is] policy . . . .

*Duncan v. State*, 163 Ga. App. 148, 294 S.E.2d 365, 366-67 (1982).

¶10.    We agree with the Georgia Court of Appeals. Section 17-25-11 likewise seeks to help protect the peace and safety of the public, by allowing law-enforcement personnel to serve

7

while off-duty and in uniform as peace-keepers in private establishments open to the general public.

¶11. Showing indifference to this aim, as well as contempt for Deputy Cox and his uniform, Bates became disorderly, repeatedly threatened physical violence against Deputy Cox, and then fired his gun. This conduct is exactly what the Legislature had in mind with the enactment of Mississippi Code Section 97-3-7(1)(b) (enhancing penalty when the victim is a law-enforcement officer or other enumerated protected class).

¶12. "Deputy Cox's off-duty work as a private security guard did not restrict his ability to act within the scope of his duties as a law enforcement officer." *Bates v. State*, 2014 WL 3824038, at *4. This, as the Court of Appeals rightly opined, "does not mean that every action Deputy Cox performed for his private employer fell within the scope of his duties as a law enforcement officer." *Id*. "But neither does it mean–as Bates tries to argue–that none of Deputy Cox's actions could have fallen within the scope of his official duties." *Id*. Bates clearly was aware that Deputy Cox was a police officer, and the evidence presented sufficiently supports the jury's finding that Deputy Cox was acting within the scope of his duty as a law-enforcement officer when Bates assaulted him.

¶13. The dissent contends that our mention of the fact that Bates was aware that Deputy Cox was a police officer is misplaced, because, one: "knowledge by the defendant that the victim is a law-enforcement officers is not an element of the statute and has no bearing whatsoever on whether the officer is acting within the scope of his office or duty[;]" and, two: if knowledge were an element of the crime, "it would make it difficult to ever achieve

8

a conviction for the assault of an undercover law-enforcement officer." *See* Dis. Op. ¶ 43 and n.9.

¶14.    We point out the case of ***Dotson v. State***, 358 So. 2d 1321 (Miss. 1978), where this Court addressed the issue of whether, to sustain a conviction for simple assault on a law enforcement officer, it is necessary for the accused to have knowledge that the individual assaulted was a police officer.  In ***Dotson***, two police officers had a warrant to search Frederick Dotson's vehicle. ***Id***. at 1321.  One of the officers approached Dotson's car while it was stopped at a red light, walked up to Dotson's open window and shouted, "Dotson, freeze police." ***Id***.  The officer was wearing nothing that would identify him as a police officer. ***Id***.  Dotson pointed a gun at the plain-clothes officer and drove off at a high rate of speed. ***Id***.  A jury later found Dotson guilty of simple assault on a police officer. ***Id***.  This Court reversed Dotson's conviction on appeal and remanded for the jury to determine whether Dotson knew that the victim was a police officer. ***Id***. at 1323.

¶15.    The ***Dotson*** Court reasoned as follows: "The crucial question, which has not been previously decided in this state, is whether or not under the circumstances and facts hereinabove related, the court should have submitted to the jury the question of whether or not appellant knew Livingston to be a police officer acting in the line of duty." ***Id***. at 1321. The ***Dotson*** Court noted that Section 97-3-7(1) does not set forth that the accused must know the person assaulted to be a law-enforcement officer. ***Id***.  The ***Dotson*** Court then noted that federal courts have construed 18 U.S.C. § 111 (which makes it a violation to assault a federal officer) to mean that, generally, knowledge (*scienter*) is not necessary. ***Id***.  But, "if the

officer stands in the position of an aggressor or of a private individual committing a tort, and his identity is not known to the accused, then the accused has the right to use such force as may be necessary to protect himself from such assault or tort and that, in such a situation, the government must prove the defendant knew the person assaulted by him to be a police officer." *Id*. *Dotson* related the following from the Seventh Circuit Court of Appeals:

> "In short, then, where a defendant charged with violating [§] 111 claims that he was unaware that the victim was a federal officer, the question becomes: would the defendant have been justified, because of the agent's actions, in using force against the agent had the latter, in fact, been a 'civilian.' If the defendant made an honest mistake of fact with respect to the agent's status and the defendant's use of force would have been justified against a private citizen, then he cannot be held criminally liable under [§] 111. For to hold him liable would create a situation 'where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected.' 420 U.S. at 685, 95 S. Ct. at 1264. If, on the other hand, the defendant would not have been justified in using force against a private citizen or if the defendant used more force than the law permitted, *see United States v. Perkins*, *supra* (428 F.2d 652 (1st Cir. 1973), *cert. den.* 417 U.S. 913, 94 S. Ct. 2612, 41 L. Ed.2d 217 (1974)), his mistake as to the agent's status would be no defense to an action under [Section] 111."

*Dotson*, 358 So. 2d at1322-23 (quoting *United States v. Hillsman*, 522 F.2d 454, 460 (7th Cir. 1975), *cert. den.*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed. 410 (1975)).

¶16.    Speaking to Mississippi law, the *Dotson* Court said:

> When there is no doubt of the defendant's unlawful intention, knowledge of the official capacity of the victim is invariably unnecessary; the assailant takes his victim as he finds him. But if the defendant asserts a lack of intention or wilfulness based upon ignorance of the identity of the victim and ignorance of the victim's official privilege to interfere with the defendant's person or freedom of movement, the jury must be allowed to consider the defendant's evidence tending to show that he was ignorant of the official capacity of the victim.  For only then can the jury give fair consideration to whether the assault was an intentional act wilfully done without legal excuse.

10

*Id*. at 1323 (citation and quotations omitted). Applying Mississippi law to the facts and circumstances of the case, the ***Dotson*** Court reasoned that it was understandable that the defendant "reasonably could have assumed that the individual was some person unconnected with the police department, who may have been attempting to do him some bodily harm[;] [t]his at a time when appellant was seated in his automobile awaiting change of red light and apparently not violating any law." *Id*. Accordingly, the ***Dotson*** Court held that, "under the facts of this case, the issue of whether appellant knew, or reasonably should have known, that Livingston was a police officer should have been submitted to the jury." *Id*.

¶17. The case before us is distinguishable from ***Dotson*** in that, here, there was no question for the jury to decide as to whether Bates knew or should have known that Cox was a law-enforcement officer. Considering what happened in this case in the light most favorable to the State, no doubt existed as to Bates's unlawful intention–that being Bates's attempt by physical menace to put Deputy Cox in fear of imminent serious bodily harm.

¶18. We point out ***Dotson*** to quell any concerns that our relation of the fact that Bates knew Officer Cox was a police officer might somehow in the future make it more difficult to secure a conviction of an assault against undercover officers, plain-clothes officers, or any other officers or officials not readily identifiable by a uniform. By pointing out that Bates knew Officer Cox was a police officer, we are in no way adding a new element to the statute. Rather, we are impressing upon the Legislature's intent behind both Section 97-3-7(1) and Section 17-25-11, and the Court of Appeals having correctly construed the two sections *in pari materia*.

11

¶19. That Deputy Cox was in full uniform was a factor for the jury to take into consideration on the question of whether Deputy Cox was acting within the scope of his duty as a law-enforcement officer when Bates assaulted him. For our purposes, however, in speaking to and construing Mississippi law, we, as did the Court of Appeals, recognize that one of the clear objectives of Section 97-3-7(1) is to protect law-enforcement officers. As the facts of this case illustrate, Bates took offense to Deputy Cox being in uniform, and Bates's hostility escalated because of it–a circumstance that lies in direct contravention of the intent behind Section 17-25-11. This convinces us even more that the Legislature intended broadly to prohibit harm or threats thereof to law-enforcement officials.

**CONCLUSION**

¶20. For these reasons, we affirm the judgment of the Court of Appeals as well as the trial court's judgment of conviction of simple assault on a law-enforcement officer.

¶21. **THE JUDGMENTS OF THE COURT OF APPEALS AND THE HINDS COUNTY CIRCUIT COURT ARE AFFIRMED. CONVICTION OF SIMPLE ASSAULT ON A LAW ENFORCEMENT OFFICER AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT IS GIVEN CREDIT FOR TIME SERVED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER AND COLEMAN, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**KING, JUSTICE, DISSENTING:**

¶22. Because I believe that Officer Cox was not acting within the scope of his office or duty at the time the assault occurred, I respectfully dissent. I also believe this Court should

address the Court of Appeals' erroneous decision on an evidentiary issue; thus, I will also address the admission of lay testimony of a nurse who did not treat Bates.

¶23.    First, it is necessary to expand on the majority's recitation of facts. On June 25, 2011, into the early morning of June 26, 2011, Deputy James D. Cox, a patrol deputy with the Hinds County Sheriff's Department, was working off-duty as a security guard/bouncer for Reed Pierce's.  The *bar manager* instructed Cox to tell Bates to leave, and Cox complied. When Bates responded belligerently, Cox and two other security guards escorted Bates out of the building. The other two security guards were Jeremy Dolan and Matthew Gordon.  On June 25, 2011, Dolan was employed as a mechanic at Gateway Tire and Service and as a security guard/bouncer at Reed Pierce's, and he was not a law enforcement officer in June of 2011.  In June 2011, Gordon was employed as a security guard at Reed Pierce's.  He testified that "that's my job to get the last people out." Cox also testified that, once they were standing outside, he "was tempted at that time to make an arrest, but I didn't because as we were speaking to him, he was walking toward his vehicle, but he was still making threats back to us." Cox did not testify as to the basis on which he would have made an arrest at that time.

¶24.    Cox testified that after he, Bates, and the other two guards stepped outside, Reed Pierce's locked its doors. Neither of the other two security guards testified that Reed Pierce's locked the doors, and Gordon testified that he and Dolan went back inside Reed Pierce's once Cox began pursuing Bates.  It is clear from the record that, after Bates entered his

13

vehicle, his gun discharged, although it is disputed whether the discharge was purposeful or accidental.

¶25.    Bates was indicted for aggravated assault of a law enforcement officer acting within the "scope of his duty and office" pursuant to Mississippi Code Section 97-3-7(2)(b)(a).

¶26.    At trial, Dana Sims, an attorney for the Sheriff's Department, testified regarding the department's policies and procedures regarding off-duty work, as well as whether Cox had followed those procedures, despite the fact that she was not working for the Sheriff's Department in June 2011; thus she had no personal knowledge of the department's policies and procedures at that time, an important issue, given that she was a fact witness, not an expert.[2]  She testified that when deputies are off-duty, "they are still considered sheriff's deputies, therefore they do have their police powers."  She noted that, whether a deputy is "at home or if he's driving down the street" he is "still a Hinds County sheriff's deputy."  Despite the fact that she was allegedly a fact witness, the State improperly referred to her as an "expert" on this issue.  Sims further testified that the reasons behind allowing deputies to do off-duty work are 1) to give the deputies extra money, 2) for the benefit of the businesses and their patrons, 3) and to give the Hinds County Sheriff's Department a larger presence in the county.

---

[2]Bates vigorously objected to her testimony being admitted, essentially arguing that her testimony that deputies were "24 hours" was legal testimony that foreclosed the jury fact issue of whether Cox was acting within his office and duty when he was allegedly assaulted. Bates also objected because the State did not produce copies of the "policies and procedures" to which Sims repeatedly referred.  At one point, the State even improperly referred to Sims as "the expert for the police department," despite not qualifying her as one.

14

¶27. Bates then testified, as noted, that he and Cox did have words, that he left, as requested, and that the gun fired accidentally. He also testified that, after the gun fired, he had ringing in his ears and that it may have burned him. ("I thought – I guess – I don't know if it burned – it burned me."). He further testified that he looked at his arm and "notice[d] a little red rash but no wounds." In response to this testimony, the State insisted on putting on a "rebuttal witness." The State called Travis Williams, a nurse with the Hinds County Detention Center. Bates objected to his testimony multiple times. The court found that Bates "brought his medical condition into this trial and he accordingly has waived the medical privilege." He also found that, because the defense asked to see a copy of the records from which the nurse was going to testify practically verbatim (as a proffer was made), that the defendant "waived the medical privilege as to those records." The court ultimately found, during the course of multiple objections and arguments from the defendant, that "[t]he witness is not offering an expert witness opinion. He's offering a medical lay fact analysis, and I believe it's probative."

¶28. Williams testified that he had "looked back at the records" for Bates. He also testified that he was "involved" in the care of Bates. He testified that his involvement was that he "noted off an order" on Bates when he went to see the doctor. However, he also admitted that this "involvement" in Bates's care did not actually involve ever seeing Bates – Williams did not see or treat Bates in any way for the duration of the time that Bates was in the Hinds County Detention Center. Moreover, Bates was admitted to the jail on June 26, 2011, and Williams did not even "note off" anything regarding Bates until June 29, 2011.

15

¶29. Williams testified that the intake and medical forms handed to him were of the "type of document that is regularly kept in the course of business at the Hinds County Detention Center." He further agreed with the prosecutor that it is "the type of document that [he] refer[s] to that [he] ha[s] to look at in order to provide care." The substance of his direct testimony is as follows:

Q. Okay. And what is the document.

A. It's the health screening form.

Q. Okay. Now, in the process of this health screening, does this document indicate that Mr. Bates had any obvious injury to either arm?

A. No, ma'am.

Q. Does this document indicate that Mr. Bates had any obvious rash or redness to any arm – either arm?

A. No, ma'am.

Q. Does this document indicate that on that day of June 26th, 2011, Mr. Bates complained of needing medical treatment for either arm?

A. No, ma'am.

Q. Does this document from June 26th, 2011 indicate that Mr. Bates let anyone know that he has any type of injury to either arm?

A. No, ma'am.

Q. Okay. Now, at the bottom of that document, was Mr. Bates informed about the medical services that could be provided to him?

A. Yes, ma'am.

Q. How so? How did he indicate it? Well, let me go back. That's a bad question.

16

Did Mr. Bates indicate that he knew of the medical services that were available to him?

A. Yes, ma'am.

Q. How did he indicate that?

A. He checked yes that he was informed.

Q. Did he sign the document?

A. Yes, ma'am.

Q. Okay. On that health screening form or intake form on June 26th, 2011, did Mr. Bates indicate that he had trouble with ringing in his ears?

A. No, ma'am.

Q. And on that date, did Mr. Bates indicated [sic] that he had any kind of pain or difficulty hearing?

A. No, ma'am.

Q. Okay. If you would, Nurse Williams, would you look through and see if at any point in time Mr. Bates made anyone aware of problems with rashes or redness of his arms?

A. (Witness reviewing document). No, ma'am.

Q. And as you were looking through that document, did you see that at any point in time, starting with June 26th, 2011 – whether or not Mr. Bates let anyone know that he had any problems with his ears ringing or hurting?

A. No, ma'am.

Q. Did Mr. Bates receive treatment for either the arm rash, burn, whatever, or ear problems while he was there?

A. No, ma'am.

17

Williams also admitted that everything to which he testified was simply what was on the document, and was not based upon any interactions between Williams and Bates.

¶30. The documents from which Williams essentially read include the "Health Screening Form" filled out on June 26, 2011, by Crystal Houston, a Hinds County Sheriff's Office "Screening Officer," not a medical professional. It also includes a general "Jail Intake Report" which lists intake property and asks Bates to acknowledge that he knows how to ask for medical attention, also apparently filled out by Officer Crystal Houston. Also included is a "Suicide Prevention Screening" filled out by Crystal Houston and a "Pre-classification" form filled out by Crystal Houston. The packet also includes a "Medical Encounter Record" dated June 30, 2011, a "Doctor's Orders" with notes dated June 28, 2011, and June 30, 2011, a "Health Services Request Form," and a "Special Diet Order." Williams primarily read from the intake forms from June 26, 2011.

¶31. On cross-examination, Bates made clear that Williams never saw him, and noted that the forms were rather vague regarding medical care. On redirect examination, despite Williams never having seen Bates, and despite Williams not even "noting off" on Bates's forms until June 28, 2011, the following exchange occurred:

> Q. Could you just look back through the records one more time and tell me whether or not anywhere in these records there's an indication by Mr. Bates that he had injuries to his arms and/or ears on June 26, 2011 or afterward.
>
> A. (Witness reviewing document). No, ma'am.

¶32. During closing arguments, Bates argued that the State had not proven that Cox was acting within the duty and scope of his office as a law enforcement officer. The State

18

continued to argue that Cox was acting within the duty and scope of his office as a law enforcement officer twenty-four hours a day, seven days a week. It even stated that "keep in mind that 24/7 on duty coming from the attorney for the Hinds County Sheriff's Department, that proves that Cox was within the course and scope of his duty."

¶33. After the jury found Bates guilty of simple assault on a law enforcement officer, the trial court sentenced Bates to five years in prison, the maximum penalty for the crime of which he was convicted, with the reasoning that, despite Bates's clean past and family members vouching for him, the court needed to deter others from committing this crime, with the court noting multiple times that the "jury gave him a break" by not convicting him of aggravated assault.[3]

¶34. Bates appealed, arguing that the evidence was insufficient to support the element that Cox was acting as a law enforcement officer and that the trial court erred in allowing Nurse Williams to testify as to the jail intake record. The State, as it did at trial, argued that Cox was within the scope of his office and duty as a law enforcement officer because officers are always on duty and also because Cox was wearing his uniform, and furthermore, because his outside employment for Reed Pierce's was approved by the Sheriff's Department. The State further argued that Nurse Williams's testimony was admissible because the "testimony was

---

[3]These are troubling statements because the jury did not give Bates a "break;" it found that the State did not meet its burden of proof for aggravated assault. While the Legislature intended to make law enforcement officers a protected class in the assault statute, it did not intend to authorize judges to lessen or degrade the rights of criminal defendants. In this case, where the jury acquitted Bates of aggravated assault, the judge appears to have presumed that the jury did so out of the kindness of its heart, when he should have given Bates the benefit of the acquittal because the State failed to prove its case.

within Williams'[s] personal knowledge of Bates['s] medical condition while Bates was in the Hinds County Detention Center." The Court of Appeals affirmed the trial court's judgment. ***Bates v. State***, __ So. 3d __, 2014 WL 3824038, No. 2013-KA-00097-COA (Miss. Ct. App. Aug. 5, 2014). The majority now affirms the Court of Appeals' holding that nothing in Cox's private employment prevented him from exercising his police powers. Maj. Op. ¶¶6-8, 12. The majority further agrees with the Court of Appeals that Cox was working in uniform with the approval of the Sheriff's Department, and that his initial request was on behalf of Reed Pierce's, but "Bates's hostile reaction triggered Cox to switch into law-enforcement mode." Maj. Op. at ¶8. The Court of Appeals also held that the trial court did not abuse its discretion in admitting Nurse Williams's testimony because Williams was "part of the team responsible for Bates's medical care that night. In this role, Williams had personal knowledge of the jail's procedures for providing medical care for new inmates who require it."[4] ***Bates***, 2014 WL 3824038 at *5. It found that the fact that Williams was only "indirectly" involved in Bates's care went to the weight and credibility of the testimony, not to the admissibility. ***Id.*** at *6. The majority does not address this issue.

## ANALYSIS

### 1. Sufficiency of the Evidence

¶35. Because the standard of review was not outlined by the majority, this opinion will detail it. In reviewing a conviction, the evidence is sufficient if, in light of the standard of

---

[4]There is utterly nothing in the record indicating that Williams was even at the jail on the date Bates was booked. Moreover, it is undisputed that Williams had no involvement with Bates's case until two days after his intake, and then only in the form of noting off on an order.

proof of beyond a reasonable doubt, any rational trier of fact could have found the element at issue or elements of the crime beyond a reasonable doubt. *Gilpatrick v. State*, 991 So. 2d 130, 133-34 (Miss. 2008). However, if reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty, the Court must reverse. *Id.* Determining what standard courts must apply to ascertain when the elements of assault on a law enforcement officer are met is a legal question and is examined de novo. *Smothers v. State*, 741 So. 2d 205, 206 (Miss. 1999).

¶36. Bates was convicted of simple assault on a law enforcement officer. The applicable portion of the assault statute in effect at the time of the incident[5] provided that "[a] person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; . . . or (c) attempts by physical menace to put another in fear of imminent serious bodily harm[.]" Miss. Code Ann. § 97-3-7(1) (Supp. 2010). The punishment is enhanced when the simple assault is committed on a law enforcement officer who is "acting within the scope of his duty, office or employment." *Id.* ("However, a person convicted of simple assault (a) upon a . . . law enforcement officer . . . while such . . . law enforcement officer . . . is acting within the scope of his duty, office or employment . . . shall be punished by a fine of not more than One Thousand Dollars ($1,000.00) or by imprisonment for not more than five (5) years, or both."). Bates does not challenge the evidence to support the simple assault elements, nor does he challenge whether Cox was a

---

[5]The statute has since been amended several times. It currently states that "Assault upon any of the following listed persons is an aggravating circumstance for charging . . . if the person is: . . . (a) A . . . law enforcement officer . . . when that person is acting within the scope of his duty, office or employment." Miss. Code Ann. § 97-3-7 (Supp. 2014).

law enforcement officer. What he challenges is the sufficiency of the evidence supporting the element that Cox was "acting within the scope of his duty, office or employment." Because, as the majority notes, it is undisputed that Cox was not acting within the scope of his "employment" as a law enforcement officer, the issue is necessarily whether sufficient evidence exists as to whether Cox was acting within the scope of his "duty" or "office."

¶37. The State argued on appeal, as it did at trial, without citation to any law or policy, that Hinds County Sheriff's deputies are subject to call and duty at any time, twenty-four hours a day, seven days a week. It suggests, multiple times both in trial and on appeal, that a deputy is always acting within the scope of his employment, duty, or office under the assault statute, simply because he is "always on call," without bothering to back up the assertion that he is always on call. The State's position is obviously incorrect, and would lead to absurd results.[6] The statute clearly contemplates that the assault be under circumstances in which the victim is clearly acting as a law enforcement officer, not in which he is acting as an average civilian who happens to also be employed as a law enforcement officer. The majority does not appear to completely embrace the State's position (the position the State has advocated during the trial and appeal of this case), yet it posits that, because Cox was wearing his uniform, and because he had permission to work in private employment, this

---

[6]Taking the State's espoused position at face value yields absurd results. For example, if an officer, while in uniform, stopped by a bar for a drink after completing his shift and had an altercation with another patron, conceivably that patron could be convicted of assault upon a law enforcement officer merely because the officer was in uniform and supposedly on call "24/7."

22

somehow renders him as acting within the scope of his duty or office.[7] This does not explain how his *actions* at the time of the assault, as is required by the plain language of the statute, are within the scope of his duty and office; it simply relies on his appearance.

¶38.   The majority completely ignores this Court's controlling precedent regarding the standard we must apply to determine whether a police officer is within the scope of his office or duty under the assault statute.  In ***Callahan v. State***, this Court addressed the issue of an assault on someone who may or may not have been acting as a law enforcement officer, and interpreted Section 97-3-7.[8] ***Callahan v. State***, 419 So. 2d 165 (Miss. 1982).  In ***Callahan***, the Court notes that the town of Tchula, Mississippi, had been beset with "confusion and troubles."  *Id.* at 167.  Tchula was governed by a mayor and five alderman.  *Id.*  Most of the police officers in town quit due to a failure to be paid; however, James Harris, the victim of assault in this case, remained in his job as a police officer.  *Id.*  On April 30, 1980, two of the alderman called a special meeting, pursuant to their statutory authority to do so.  *Id.*   The agenda of the special meeting included electing a mayor pro-tem and a chief of police.  *Id.*  Jim Andrews, a former Tchula police chief, assumed the duties of police chief that night, and inconsistencies in the testimony are abundant as to "the manner and authority under which this was done."  *Id.*  It appears that he was appointed acting chief of police by a majority of

---

[7]If Bates had confronted Cox at the club over a personal matter, such as Cox having an illicit relationship with Bates's wife, and the confrontation resulted in blows being struck, under the majority's view, simply because Cox was in uniform and had received permission to work as private-duty security at the club, Bates could be convicted of assault upon a law enforcement officer.  Such is the logical absurdity of the majority position.

[8]The Court addressed the 1972 version of the statute, but the pertinent language is substantially the same.

the Board of Aldermen that night, but without the agreement of two aldermen and the mayor; although the legality of the appointment and whether it actually occurred, were disputed. *Id.* at 168-70. One witness testified that the only acting policeman hired by the Board was Harris. *Id.* at 169. Andrews testified that he asked Harris to work the night shift that night, and that he was thus on-duty. *Id.* at 170. Harris, who had been a town policeman for four years, complied. *Id.* When the Mayor, Eddie James Carthan, discovered that Andrews had taken over the police department after the meeting, he gathered members of the police department, a member of the Board of Aldermen, and people whom Carthan designated as "auxiliary policeman," and they all went to the town hall, which included the police department, with weapons. *Id.* at 167-68. A "tussle" ensued, during which Andrews was grazed by a bullet. *Id.* at 168-70. The mayor and his group were prosecuted for assault on Harris, who was at the police department when the group arrived. *Id.* at 171. The mayor testified that Harris was not on duty the night that the incident occurred. *Id.* at 174.

¶39. The defendants claimed that they were entitled to a peremptory instruction because, they argued, the State failed to prove that Harris was a police officer who was acting within the scope of his duty. *Id.* at 174. The Court noted that it was undisputed that Harris was a police officer, thus the only question was whether he was "on duty." The Court determined that the standard of whether Harris was acting "within the scope of his office as a full-time policeman depends on whether or not he was performing a legal duty associated with his office as distinguished from engaging in a personal frolic of his own." *Id.* at 174-75. The Court determined that enough conflicting information existed as to whether Andrews was

24

properly appointed and thus had properly ordered Harris to be on-duty to render Harris's status a jury question. *Id.* at 175. Thus, whether Officer Cox was acting within the scope of his duty or office depends on whether he was performing a *legal duty* associated with his office, or was engaging in a personal task of his own. The majority declines to apply this controlling standard, instead relying on uniforms and permission to engage in outside employment, as well as belligerent, yet not criminal, behavior.

¶40.    As the majority emphasizes, it is clear that a law enforcement officer has the authority to make an arrest when he witnesses a crime, or under other statutorily-outlined circumstances, just as does a private citizen. Miss. Code Ann. § 99-3-7 (Rev. 2007). Yet, the majority points to no crime that Cox witnessed; rather, it points to mere belligerence as allowing Cox to morph into "law enforcement mode." Furthermore, most of the cases cited by the majority and the Court of Appeals deal with police officers who were privately employed and did indeed witness an actual crime, such as battery or shoplifting, and responded to the crime, unlike this case in which the assertion seems to be that maybe Cox was possibly worried that maybe a crime would perhaps potentially occur. *See S.D. v. State*, 11 So. 3d 401, 402-03 (Fla. Dist. Ct. App. 2009) (Officer broke up a fight (assault and battery, disturbing the peace), separated the combatants, and escorted one off the premises, preventing her from returning(trespassing)); *Salt Lake City v. Christensen*, 167 P.3d 496 (Utah Ct. App. 2007) (officer knew defendant was a domestic violence suspect, defendant threatened to murder his brother upon release, threatened a nurse attempting to help him with physical violence, then swung at and missed the officer, before the officer restrained him and

25

was kicked and wrestled with); ***Davis v. Commonwealth***, 605 S.E.2d 790 (Va. Ct. App. 2004) (officer was in process of arresting defendant for possession of illegal drugs after officer saw defendant in possession of heroin); ***State v. Graham***, 927 P.2d 227 (Wash. 1996) (stating that "a police officer is a public servant or peace officer who has the authority to act as a police officer whenever the officer *reasonably believes that a crime is committed in his or her presence*, whether the officer is on or off duty" (emphasis added)) (officers with extensive narcotics training witnessed defendant with large wads of cash and a plastic bag containing white pebbles believed to be cocaine); ***State v. Wilen***, 539 N.W.2d 650 (Neb. Ct. App. 1995) (officer smelled alcohol on a person who, shortly thereafter, was involved in an automobile accident, which officer went to investigate). In this case, Cox did not witness a potential crime until the gun was fired, after which, he arguably was in "law enforcement mode." But until the shot was fired, no potential crime had occurred. Yet, the majority and the Court of Appeals somehow determined that "Bates's hostile reaction triggered Deputy Cox to switch into law-enforcement mode." Maj. Op. ¶8. A belligerent attitude is not a crime for which Deputy Cox has an arguable legal duty to respond; rather, ejecting patrons with a belligerent attitude is part of the job of being a bouncer, and was a personal task done solely in his employment for the private employer.

¶41.    In Florida, the statute criminalizing battery on a law enforcement officer requires that the officer be engaged in the performance of a lawful duty. *See **Nicolosi v. State***, 783 So. 2d 1095, 1096 (Fl. Dist. Ct. App. 2001). Florida law allows that a police officer can be engaged in a lawful duty when working an off-duty job, as the off-duty status does not limit

26

the "right to exercise police authority in the presence of *criminal activity*." *Id.* (emphasis added) (internal quotations omitted). In *Nicolosi*, a police officer in uniform was working an off-duty job at a nightclub. *Id.* at 1096-97. One of his duties was checking identification, and Nicolosi attempted to obtain admission to the nightclub approximately ten times after the officer's decision to deny her admission. *Id.* at 1097. After her refusal to leave, the police officer issued her a trespass warrant, which was ruled to be of no force because the area that she refused to leave was in fact a public sidewalk. *Id.* at 1097, 1097 n.2. She then called the officer names, slapped the officer, and was arrested. *Id.* at 1097. The court found an absence of evidence that the police officer was engaged in a lawful duty at the time of the battery, because "[n]o criminal activity or investigation of criminal activity on the part of Nicolosi prior to the battery was proven, nor was there proof of any other activities of an official police nature, as opposed to activities exclusively for the interest of the private employer." *Id.* The case at hand is similar. Cox was acting as a security guard/bouncer, and in that duty, dealing with a belligerent patron. He did not, however, encounter criminal activity or investigation of criminal activity prior to the assault, but was ejecting a patron from a bar at closing time, exclusively for the interest of his private employer.

¶42.    Similarly, in *Burney v. State*, a court found that the defendant could not be convicted of battery of a police officer, because the officer was not engaged in the performance of a lawful duty when the battery occurred. *Burney v. State*, 93 So. 3d 510 (Fl. Dist. Ct. App. 2012). In *Burney*, an off-duty officer, not in uniform, was patronizing a store. *Id.* at 511. The defendant, who had psychological problems, "approached the officer with apparent

27

knowledge that the man was a law enforcement officer" and ultimately made contact with the officer. *Id.* The court noted that the defendant appeared to have known that the victim was a law enforcement officer and targeted him because of this fact; however, "under the language of the statute, that is not enough to transform this battery into a battery on a law enforcement officer." *Id.* at 512.

¶43.    Likewise, under the assault statute in Mississippi, mere knowledge that the victim was a law enforcement officer, and the mere wearing of the uniform, are not enough to transform the assault into an assault on a law enforcement officer. According to the plain language of the statute, the officer must be "*acting within the scope* of his duty, office or employment." Miss. Code Ann. § 97-3-7 (Rev. 2014) (emphasis added). Thus, the element surrounds the officer's actions at the time of the assault, i.e., whether he was performing a legal or lawful duty, not whether the alleged perpetrator knew of his status as a law enforcement officer, and not whether he had simply decided to put on his uniform. *See Callahan*, 419 So. 2d at 174-75. The majority, however, emphasizes that "Bates clearly was aware that Deputy Cox was a police officer." Maj. Op. ¶12. Such an emphasis is misplaced, given that knowledge by the defendant that the victim is a law enforcement officer is not an element of the statute and has no bearing whatsoever on whether the officer is acting within the scope of his office or duty.[9] The majority attempts to rebut this notion by discussing *Dotson v. State*, 358 So. 2d

_____

[9]Indeed, if knowledge is such an important part of the crime, despite the Legislature having left it out of the statute completely, it would make it difficult to ever achieve a conviction for the assault of an undercover law enforcement officer. If the Legislature deems knowledge of a person's status an important element of this crime, then this Court should respect the separation of powers and allow the Legislature to so amend the statute.

1321 (Miss. 1978), a case that is completely inapposite. The assault statute requires some form of intention to harm another (or put another in fear of harm), and *Dotson* notes that when the defendant asserts lack of intention to cause harm because he did not realize he was given a lawful order, but thought he was being subjected to assault or tort by a private citizen, knowledge may be relevant to whether the defendant possessed the requisite intent to assault. *Dotson*, 358 So. 2d at 1323. This is essentially allowing a defense of self-defense. *Dotson* has absolutely no bearing on the element of the statute regarding whether a law enforcement officer was acting within the scope of his office or duty; it only addresses the intent to assault elements in the statute. The majority is correct – Bates did not challenge his underlying assault conviction, or any finding regarding his intent to assault. Thus, as stated in *Dotson*, "[w]hen there is no doubt of the defendant's unlawful intention, knowledge of the official capacity of the victim is invariably unnecessary." *Id.* at 1323. This is exactly why the majority's emphasis on Bates's knowledge of Cox's official capacity is perplexing and unnecessary. Knowledge of his status is not an element in the statute and has no bearing on whether he was acting within the scope of his office and duty. Since that is the only issue before us, the majority now adds a new element to the crime, not found in the statute – knowledge of the official capacity of the victim. Such addition to the statute – requiring knowledge of the victim's status in order to support a finding that the officer was acting within the scope of his office or duty – is new law, not found in the statute, and will in the future make it more difficult to secure a conviction of assault on an undercover officer, a

29

plain clothes officer, or any other officer or official not readily identifiable by a uniform or the like.

¶44.   In this case, the State failed to enter any "fact of general orders" of the police department into evidence to show that Cox was on-duty twenty-four hours a day. The State failed to enter any governmental regulations into evidence showing that Cox was on-duty twenty-four hours a day. The only evidence that the State adduced that Cox was on-duty for twenty-four hours a day was the testimony of Dana Sims, who did not have personal knowledge of the policies of the sheriff's department before she worked there. M.R.E. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."). If the State wanted Sims to be able to testify as a legal expert regarding past policies, it needed to qualify her as an expert, not as a fact witness. The State woefully failed to meet its burden of proof of beyond a reasonable doubt. Moreover, even if the State did prove that Cox was on-duty twenty-four hours a day, that does not necessitate a finding that he was acting within the scope of his duty or office at the moment the assault occurred.

> The fact that the general orders of a city police department provide that police officers are on duty 24 hours a day does not necessitate the conclusion that all acts taken by an off-duty police officer are deemed to be in the performance of his or her duties as a police officer; a municipality is liable only for those acts of an off-duty officer that fall within the scope of his or her employment, specifically those acts performed to enforce the law and preserve the peace.

57 Am. Jur. 2d *Municipal, County, School, and State Tort Liability* § 387 (2012). Additionally, for liability purposes,

> In determining whether the acts of an off-duty police officer may be considered within the scope of the officer's employment for purposes of his or her employer's liability under respondeat superior, the issue may be controlled by the existence of governmental regulations providing that police officers are always on duty, though periodically relieved from routine performance of their duty, and are required to carry firearms at all times, remain subject to orders from superior officers and calls from private citizens, and must take proper police action in any matter coming to their attention.

*Id.* The State did focus on the fact that Cox had permission from the Hinds County Sheriff's Department to work off-duty. Miss. Code Ann. § 17-25-11 (Rev. 2012). But permission to do off-duty work in which he is paid, supervised, and directed by a private employer, does not equate to acting within the scope of his duty and office as a Hinds County Sheriff's deputy.[10] Section 17-25-11 also provides that the Hinds County Sheriff's Department is not liable for the actions of an off-duty law enforcement officer privately employed as security, which bolsters the idea that permission does not equal duty. *Id.*

¶45. Cox was acting as a security guard/bouncer. At the direction of his private employer, he ejected an arguably belligerent patron from the bar at closing time. Indeed, when questioned by the patron, no crime was being committed. Notably, Cox did not call for police backup to eject Bates, but rather received backup from two bouncers who were not in law enforcement, bolstering the notion that he was acting as a bouncer, not as a deputy. Again, when he escorted Bates out of the bar, no crime had been committed, no criminal

---

[10]If that were true, then all the Supreme Court law clerks who teach legal writing at Mississippi College law school with the express permission of the Court would be deemed as acting within the scope of their office and duty with the Court while teaching for Mississippi College, under the direction and supervision of Mississippi College, while being paid by Mississippi College. Thus, under the majority's logic, if a law clerk committed sexual harassment while teaching at Mississippi College, this Court would be liable.

31

activity was alleged, and no criminal investigation was occurring. Cox was simply escorting a patron from the bar at the direction of the bar manager, along with two other bouncers, while they were under the control of their boss at the bar, not under the control of the Sheriff.[11] One of the other bouncer/security guards even testified that getting the last people out was his job as a bouncer/security guard. Common sense also belies that moving even belligerent customers out of a bar at closing time is part and parcel of the job of a bouncer. When the shot was fired, it seems more plausible that Cox switched into law enforcement mode, as he began a criminal investigation. But at that point, the alleged assault had already occurred.

¶46. Cox ejected a customer from the bar under the direction and control of the bar manager, when no crime had occurred and no criminal investigation was occurring – he was performing no legal duty associated with his position as a deputy at the time of the assault. Ejecting patrons at closing time is the duty of a bouncer, not a sheriff's deputy. While "frolic" may not be an ideal word to use, because Cox was working, not "playing," it is clear that he was working for his own personal purposes to make extra money and for the benefit of, and under the direction and control of, his private employer. The State did not produce any evidence whatsoever at trial, much less sufficient evidence, that Cox was, at the time of the alleged assault, performing a *legal duty* associated with his office, rather than engaging

_____

[11]Many unforseen consequences may arise from allowing Cox to be in law enforcement mode while acting as a bouncer. Such a finding would seem to nullify the limitation of liability for the government for the actions of off-duty officers found in Section 17-25-11. Moreover, if Cox had been injured while acting as a bouncer at the bar, it is likely that Hinds County would be responsible for providing benefits, as he would be acting within his scope of duty and office as a Hinds County employee.

in personal business of his own or on behalf of his private employer; it merely relied on the improper testimony of Sims for the notion that Cox was always on duty and thus always acting within the scope of his duty or office. *Callahan*, 419 So. 2d at 174-75. Thus, the State failed to meet its burden of proof on this element of Bates's crime, and the majority conveniently sidesteps this utter lack of evidence at the trial level on the State's part.

¶47. Therefore, in my view, the "law enforcement officer" enhancement to Bates's crime of simple assault should be vacated and the case remanded for resentencing for simple assault, of which sufficient evidence exists.

### 2. Nurse's Testimony

¶48. This issue was not raised in Bates's petition for certiorari and the majority does not address it. However, the Court of Appeals has promulgated incorrect law on the issue, and I believe this Court should correct that law, rather than leaving bad law on the issue as precedent.[12]

¶49. First, the Court of Appeals erroneously noted that "Williams was part of the team responsible for Bates's medical care that night," referring to the night Bates arrived at the jail. Nothing in the record demonstrates that Williams was even at work that night. Bates did not receive medical care that night. Moreover, Williams's entire involvement in Bates's care amounted to noting off on a doctor's order. It further noted that "Williams had personal knowledge of the jail's procedures for providing medical care for new inmates who require it. . . . Part of that procedure required Williams to read Bates's intake form and medical

---

[12]I do not believe that this issue is reversible error in this case; however, I am concerned about the ramifications of the Court of Appeals opinion on evidentiary law.

33

records in order to be able to care for him. So it was within Williams's personal knowledge to testify that he did not care for or medicate any burns on Bates's body because Bates made no complaint despite being given the opportunity." The Court of Appeals' recitation of the "facts" is a mischaracterization of Williams's testimony. As stated, utterly no testimony as to whether Williams was on duty the night of Bates's booking into the jail was adduced at trial. Furthermore, Williams testified that he generally relies upon intake records to provide medical care. He never testified that he reviewed Bates's records in order to provide him medical care. He testified that he had to look at records kept by "other people" and that an intake form is the "type of document" to which he has to refer in order to provide care. Yet, he never testified that he looked at Bates's form to provide care to him. And Williams arguably did not "provide" any care to Bates, since he never even met him, but merely "noted off" on a doctor's order for Bates. Williams then essentially read from the intake form. The Court of Appeals still found that Williams had personal knowledge under Mississippi Rule of Evidence 602. The State also argues that Williams's testimony is admissible under Mississippi Rule of Evidence 803(4), which allows that statements made "for *purposes* of medical diagnosis or treatment *and* describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not hearsay. M.R.E. 803(4) (emphases added). It is plainly clear that the intake record was not made for the purpose of medical diagnosis or treatment, but rather for jail intake, and moreover, the intake

34

record describes none of the issues listed, and does not do so "as reasonably pertinent to diagnosis or treatment."

¶50.    The record makes it abundantly clear that the State wanted to get the intake record into evidence.  It appears that it may likely do so, under Rule 803(8), providing that public records and reports are an exception to the hearsay rule.[13]  Or it may be able to do so under Rule 803(6) allowing the admission of records of regularly conducted business.  M.R.E. 803(6).  However, records of regularly conducted activity must be authenticated by the custodian or other qualified witness, or self-authenticated.  M.R.E. 803(6); M.R.E. 901.  The State did none of these things.  Public records also must be authenticated, and may be authenticated, for example, by the testimony of a witness with knowledge, which Williams plainly is not, or by evidence that the record was indeed from the public office where items of the same nature are kept.  M.R.E. 901.  The State introduced no evidence as to in what office intake forms are kept, or from where the intake form came.   The State simply evaded the rules of evidence by using an employee with no personal knowledge of the form and no personal knowledge of Bates to essentially read the form into the record.  This was improper, and Williams's testimony was improperly admitted.

¶51.    However, the error was harmless.  Upon cross-examination, the defense attorney elicited testimony from Williams that the types of injuries Bates claimed to have had were not of the type for which people normally seek medical attention.  This seems obviously true.

_____

[13]Matters observed by police officers and other law enforcement personnel in criminal cases are excepted from Rule 803(8).  However, that appears to apply more to police reports, investigations, and confessions, rather than an intake form, which does not exactly contain matters "observed" by police officers.

Furthermore, ample evidence aside from Williams's testimony exists to support the conviction for simple assault, *inter alia*, Cox's testimony, the testimony of the other two bouncers, the testimony of the gun expert from the crime lab, and Bates's testimony that his gun did indeed go off.

## CONCLUSION

¶52.    Bates is correct that the State did not introduce sufficient evidence to prove that his simple assault conviction should be enhanced to simple assault on a law enforcement officer, as the State failed to put forth sufficient evidence that Cox was acting within the scope of his office or duty at the time the assault occurred.  None of the evidence lent proof to the notion that Cox was performing a legal duty of his office prior to the assault.  Thus, I believe this Court should reverse the enhancement to Bates's simple assault conviction and remand the case to the trial court for resentencing for simple assault.  I also believe that this Court should correct the Court of Appeals's error in finding Williams's testimony admissible.  For those reasons, I respectfully dissent.

        **KITCHENS, J., JOINS THIS OPINION.**